Janet Doe v. Oyster Riv. School Dist. CV-95-402-SD 08/25/97   P

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Janet Doe b/m/n/f
 the Mother of Janet Doe;
Jane Doe b/m/n/f
 the Mother of Jane Doe;
Jane Doe's Mother, individually

     v.                              Civil No. 95-402-SD

Oyster River Cooperative
 School District


O R D E R


     This civil rights action raises the question of the nature of the liability of a public school district under federal law when one of its students sexually harasses other students.  The question is interesting not only for its relative novelty (most circuit courts, including the First Circuit, have not directly addressed the issue), but also because it tests the doctrine of institutional liability under the Civil Rights Acts, a subject which has recently captured much attention.

     The plaintiffs include two former students of the Oyster River Middle School, Jane and Janet, and Jane's mother.  They assert claims under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 (Title IX); 42 U.S.C. § 1983; and state law against the Oyster River Cooperative School District.

     Before the court are defendant's motions to dismiss and for summary judgment (documents 15, 16, respectively) and plaintiffs'

motion to amend the pleadings (document 19).  All three motions have been objected to.

Background

Beginning in April 1993, Jane, Janet,[1] and other female seventh-grade students allegedly were sexually harassed on a regular basis by a male fellow student (John) at the Oyster River Middle School in Durham, New Hampshire.  At the time, John's alleged behavior included exposing his genitalia, touching the girls on the leg, waist, or breast, and making very obscene comments.  He also allegedly drew sexually explicit pictures on notebooks and school property.

On June 17, during the last week of school, Janet and some other girls went to the office of the vice principal, Steven LeClair, to complain about John's continued harassment.  See Plaintiffs' Exhibits B, C.  The girls felt they needed to come in person because LeClair had previously taken no action after they had sent him an unsigned letter in May complaining about sexual harassment.

As LeClair was otherwise occupied, the girls met with a guidance counselor, Carolyn Puffer.  Puffer took notes cataloguing John's behaviors and accepted one of John's drawings from the girls.  See Plaintiffs' Exhibits B, C.  Puffer gave her notes and the drawings to LeClair, who mistakenly believed that the young women were primarily complaining about the pictures.

---

[1]The court has adopted the pseudonyms used by the parties.

He also mistakenly thought that the girls were only complaining on behalf of Jane.  See LeClair Affidavit at ¶ 6.

At some point that day, Puffer told the girls not to tell their parents about the harassment because it would only lead to lawsuits.  See Plaintiffs' Exhibit N at 98-99.

On Saturday, June 19, 1993, LeClair contacted Jane's father and informed him that there was a problem.  See Defendant's Exhibit H at 52.  That Monday, LeClair contacted Janet's mother, but only stated that Janet had reported the harassment on behalf of someone else and that the situation had been resolved.  See Plaintiffs' Exhibit G at 71.

As a result of a meeting with Jane's father, LeClair agreed to present three conditions to John's parents.  The conditions were that John would write a letter of admission which would be kept sealed by the administration and would be opened in the upcoming school year only for the purposes of discipline enhancement, that John would apologize in person to Jane, and that he would seek counseling.  See Defendant's Exhibit H at 44, 52-54, 66, 67; Plaintiffs' Exhibit F at 77.

LeClair failed to follow up on some of the conditions, although John did apologize in person to Jane.  When Jane's father telephoned LeClair in mid-August, LeClair stated that he had not yet received John's letter and that he had not pursued the matter further.  See Plaintiffs' Exhibit E at 142.  LeClair

later left the District's employ to take a position at another school.

Jane's father then sent a letter to Superintendent John Powers in a further effort to resolve the situation prior to the start of the new school year. Powers did not respond or even acknowledge the letter. At one point, the parents were informed by someone from the District that it could not inform the teachers at the school about John's inappropriate behaviors.

During the late summer, Jane's father filed a complaint about John's alleged sexual misconduct with the Durham police. In addition, LeClair received a letter of apology from John and forwarded it to the school district. See Defendant's Exhibit A at 112.

When the new school year began in September 1993, John was in Janet's section of classes; however, because of scheduling, Jane did not have any classes with John. In late September, Janet informed a guidance counselor that she was uncomfortable being in John's class. See Plaintiff's Exhibit N (Vol. III), at 33. At the time, Janet had witnessed John using inappropriate language, although it was not directed at her. See id. at 34. Later that fall, John began to engage in lewd acts reminiscent of his behavior the prior year, including touching himself in class. See id. (Vol. II), at 126. However, Janet did not report it to the school administration because, based on the school's response

4

to her complaints the prior spring, she believed the school would do nothing about it. See id. at 129. She did not know at the time that John had been required to seek counseling, although she was aware of John's verbal apology to Jane. Id. She believed that John had not been disciplined at all. See id.

In October of 1993, Janet's mother informed Janet's teachers about John's alleged sexual misconduct during the previous spring. Janet's teachers had not been informed about the previous complaints. Plaintiffs' Exhibit G at 120. Janet's mother also met many times with the school district's superintendent during the 1993/1994 school year, requesting that John be removed from the school or transferred out of her daughter's section. The school district refused. The superintendent of the school system wrote at one point that such action would be "untimely and inappropriate to the welfare and education of the accused." See Plaintiffs' Exhibit R at 4.

In October 1993 the school district held a training session on sexual harassment for teachers, students, and parents.

At the end of November 1993 Janet's mother filed a complaint with the Department of Education's Office for Civil Rights, which conducted a limited investigation into the matter. OCR determined that LeClair had not properly responded to either the unsigned letter or the verbal reports of harassment he received in the spring of 1993; however, OCR appeared to find that the

5

school district did take appropriate corrective actions from August 1993 forward. Specifically, OCR found that

> [t]he former assistant principal took no action on the letter, and he failed to adequately respond to the verbal reports of sexual harassment because he did not conduct a thorough and objective investigation, did not take immediate action to fully remediate any harm that occurred, and did not take steps reasonably calculated to prevent sexual harassment from recurring. However, since August 1993, the District has implemented a variety of corrective measures to address the incidents which the complainants reported and to educate District administrators, staff, faculty, students, and parents about recognizing and preventing sexual harassment. Also, the District has revised its policy concerning sexual harassment and is currently revising its grievance procedure which addresses allegations of sexual harassment.

Defendant's Exhibit M (letter dated Mar. 11, 1994). On February 16, 1994, the school board adopted a new policy on sexual harassment. In March the district signed an agreement for corrective action with OCR.

Although Jane was not in John's classes in the eighth grade, she did regularly encounter him in the halls, at recess, and at lunch. See Plaintiffs' Exhibit X. In October Jane learned from another student that John had referred to her as a "tuna-fish smelling cunt." See Plaintiffs' Exhibit M at 74. The assistant principal, Bette Chamberlain, investigated the matter but could make no final determination because the students gave differing versions of the events. See Defendant's Exhibit L at 142-49. As

a result, John was not disciplined.  Chamberlain stated in deposition that she observed friction on both sides.  Plaintiffs claim that Chamberlain was never properly trained about how to discipline students.

After completing eighth grade, Jane left the school district and attended private schools beginning in the ninth grade.  She left because of the totality of events involving John.  <u>See</u> Plaintiffs' Exhibit M at 55.  Janet remained in the school district.

<u>Discussion</u>

1.  <u>Standard of Review</u>

Defendant has filed a motion to dismiss and a motion for summary judgment.  Matters outside the pleadings were relied on by plaintiffs in both of their objections and by the defendant in its summary judgment motion.  When matters outside the pleadings are presented and not excluded by the court, a motion to dismiss may be treated as one for summary judgment, provided all parties have had the appropriate opportunity to respond.  <u>See</u> <u>Friedman v. Israel Labour Party</u>, 957 F. Supp. 701, 705 (E.D. Pa. 1997); Rule 12(b), Fed. R. Civ. P.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c), Fed. R. Civ. P.; <u>Lehman</u>

v. Prudential Ins. Co. of Am., 74 F.3d 323, 327 (1st Cir. 1996).
The court's function at this stage "is not [] to weigh the
evidence and determine the truth of the matter but to determine
whether there is a genuine issue for trial." Stone & Michaud
Ins., Inc. v. Bank Five for Savings, 785 F. Supp. 1065, 1068
(D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 249 (1986)).

The moving party has the burden of establishing the lack of
a genuine issue of material fact. Finn v. Consolidated Rail
Corp., 782 F.2d 13, 15 (1st Cir. 1986). The court views the
record in the light most favorable to the nonmoving party,
granting him all inferences in his favor. Caputo v. Boston
Edison Co., 924 F.2d 11, 13 (1st Cir. 1991). To survive summary
judgment, the nonmovant must make a "showing sufficient to
establish the existence of [the] element[s] essential to [his]
case," Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986), and
cannot merely rely on allegations or denials within the
pleadings. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st
Cir. 1993), cert. denied, 511 U.S. 1018 (1994) (quoting Anderson,
supra, 477 U.S. at 256).

## 2. The Title IX Claim

### a. Are Title VII standards applicable?

The threshold issue raised by the defendant is whether a school district's failure to correct student-on-student sexual harassment is the type of discriminatory conduct capable of supporting a Title IX violation. Defendant argues that although sexual harassment is a form of recognizable discrimination when it occurs in the workplace, harassment perpetrated by students, particularly juveniles, is not a form of discrimination. Continuing, defendant asserts that the standards applicable to the adult world of employment are not applicable to situations involving children or young adults in school.

Title IX of the Education Amendments of 1972, codified at 20 U.S.C. § 1681, et seq., prohibits educational institutions receiving federal funds from subjecting program participants to sex-based discrimination. The statute provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, . . . .

20 U.S.C. § 1681(a).

Title IX does not expressly state that sexual harassment can constitute discrimination under the statute. However, in some circumstances, courts have looked to Title VII of the Civil

9

Rights Act of 1964, 42 U.S.C. § 2000e, et seq., which prohibits employment discrimination, when interpreting Title IX. Specifically, courts have looked to Title VII when evaluating Title IX claims for sexual harassment brought by employees of educational institutions. See, e.g., Lipsett v. University of Puerto Rico, 864 F.2d 881, 896-97 (1st Cir. 1988). In addition, the Supreme Court has looked to Title VII principles for guidance in the course of its discussion of whether a student who is sexually harassed by a teacher is entitled to a damages remedy under Title IX. See Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 75 (1992). The Court analogized to Title VII in order to determine whether a teacher's harassment of a student constituted actionable discrimination under Title IX. Id. See also Brown v. Hot, Sexy & Safer Productions, Inc., 68 F.3d 525, 540 (1st Cir. 1995), (applying Title VII sexual harassment standards to Title IX sexual harassment case in nonemployment context), cert. denied, ___ U.S. ___, 116 S. Ct. 1044 (1996). But see Cohen v. Brown Univ., 101 F.3d 155, 176 (1st Cir. 1996) (refusing to extend Title VII standards to athletics setting), cert. denied, 117 S. Ct. 1469 (1997).

In the employment context, sexual harassment is considered to constitute a form of unlawful discrimination prohibited by Title VII. Meritor Savings Bank, F.S.B. v. Vinson, 477 U.S. 57,

10

66 (1986).[2]  Workplace sexual harassment may take the form of "hostile environment harassment."  See Lattimore v. Polaroid Corp., 99 F.3d 456, 463 (1st Cir. 1996).[3]  "Hostile environment harassment" consists of "offensive gender-based conduct that is 'severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive' and is subjectively perceived by the victim to be abusive."  Id. (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

The determination of whether a plaintiff has established a hostile or abusive workplace environment requires the court to consider all of the circumstances, but particularly those concerning (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating rather than a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance.  Brown v. Hot, Sexy & Safer Productions, Inc., supra,

_____

[2]Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

[3]Workplace sexual harassment can also take the form of "quid pro quo" harassment, which involves promises of favorable treatment or threats of unfavorable treatment calculated to coerce an employee into submitting to unwelcome sexual advances." Lattimore, supra, 99 F.3d at 463.

11

68 F.3d at 540 (citing <u>Harris</u>, <u>supra</u>, 510 U.S. at 23).[4]  As previously indicated, the relevant factors must be viewed both subjectively and objectively.  <u>Id.</u>

Although the sexual harassment standards under Title VII were crafted with the purpose of rectifying and discouraging discrimination in the workplace, the above-stated principles provide helpful guidance when harassment of students is at issue. In <u>Franklin</u>, the Supreme Court invoked Title VII principles when it discussed whether teacher-to-student sexual harassment could constitute actionable discrimination under Title IX.

> Unquestionably, Title IX placed on the [school district] the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex."  <u>We believe the same rule should apply when a teacher sexually harasses and abuses a student</u>.

<u>Franklin</u>, <u>supra</u>, 503 U.S. at 75 (quoting <u>Meritor Sav. Bank, FSB v. Vinson</u>, <u>supra</u>, 477 U.S. at 64 (emphasis added).

After <u>Franklin</u>, many lower courts have recognized that sexual harassment committed by a student can, under certain conditions, give rise to Title IX liability on the part of a school district.  <u>See, e.g.</u>, <u>Doe v. Londonderry School Dist.</u>, ___ F. Supp. ___, 1997 W.L. 400332, at *7 (D.N.H. June 12, 1997)

---

[4]Although <u>Brown</u> was a Title IX case, it made use of the quoted elements which were taken from Title VII cases.

12

(collecting cases); <u>Collier ex rel. Collier v. William Penn School Dist.</u>, 956 F. Supp. 1209, 1213 (E.D. Pa. 1997) ("Title IX should impose liability on a school district for its failure to prevent or eradicate a sexually hostile environment created by students, as that environment discriminates and limits *educational* opportunities based on sex."). <u>But see Rowinsky v. Bryan Independent School Dist.</u>, 80 F.3d 1006, 1016 (5th Cir.) ("The mere existence of sexual harassment does not necessarily constitute sexual discrimination."), <u>cert. denied</u>, 117 S. Ct. 165 (1996).

When sexual harassment, even when perpetrated by peers, reaches a level that could be actionable, i.e., a level sufficiently "severe or pervasive" to create a hostile or abusive environment, the victim of the harassment has suffered from gender discrimination. Just like the sexually harassed employee who is illegally impeded from the full enjoyment of his or her job, a sexually harassed student may likewise be cut off on the basis of sex from the privileges attending the full enjoyment of an education. Since a good education leads to access to jobs, discrimination in education "is doubly destructive for women." <u>See</u> 118 Cong. Rec. at 5804 (1972) (comments of Sen. Bayh, sponsor of Title IX). Accordingly, although the contemporaneous legislative materials do not mention sexual harassment, applying Title IX to peer sexual harassment cases is fully consistent with

one of the primary purposes behind the Act--to ensure equal

access. See id. at 5809;[5] cf. North Haven Bd. of Educ. v. Bell,

456 U.S. 512, 521 (1982) (recognizing the need to "accord [Title

IX] a sweep as broad as its language" (quotation omitted)).

Defendant maintains that such analogizing to Title VII is

flawed because it ignores the unique characteristics of student-

on-student harassment. According to defendant, student-on-

student harassment lacks a key ingredient--namely, a power

differential between the harasser and the victim. However, this

notion is difficult to reconcile with employment discrimination

cases in which courts have found that harassment perpetrated by

coworkers constitutes actionable discrimination. See, e.g.,

Lipsett, supra, 864 F.2d at 897 (noting that hostile environment

harassment occurs "when one or more supervisors or coworkers

creates an atmosphere so infused with hostility towards members

of one sex that they alter the conditions of employment for

them") (emphasis added). A school that knowingly condones sexual

harassment between students has misused its power in much the

same way that an employer does in a coworker sexual harassment

case.

_____

[5]Senator Bayh's full comment was, "So what this measure does is to strike a death blow at discrimination where it is most severely felt, where there is discrimination against women in having equal access to the kind of education they need to provide for themselves and their families." 118 Cong. Rec. at 5809.

14

Certainly there is some force to defendant's argument that the standards relevant to the "adult" workplace cannot be imported wholesale into the educational context, particularly when young children are involved. Schools are, and should be, more casual in some respects than the workplace. Name-calling, teasing, and even physical touching take on a different significance when they occur between children, and are also more common.

However, the danger that any playground tangle will be transformed into a federal action is hopefully mitigated by the strict requirements that the harassing conduct be "severe or pervasive" before being actionable. Another mitigating factor is that the trier of fact must evaluate all of the facts and circumstances before labeling conduct as "sexual harassment." The unique circumstances of the school environment may be factored into such assessment.[6]

---

[6]Defendant also argues that, unlike the employment context, schools do not have sufficient control over offending students such that their actions can be imputed to the school. The court disagrees. Schools are, or at least should be, set up with appropriate safeguards, such as informed teachers and a working system of discipline, to prevent ongoing sexual harassment. The court further notes that, just as a school is not free to expel all offending students, an employer is likewise fettered from terminating employees, who have legal rights to continued employment. However, this does not excuse an employer for failing to take remedial action, nor should it excuse a school district.

b.  When is a school district liable for sexual harassment perpetrated by a student?

Perhaps the more difficult question raised by this case is not whether student-on-student sexual harassment constitutes sexual discrimination under Title IX, but whether (and to what extent) the school district should be liable for it.  To properly analyze this issue, it is again helpful to refer to standards applicable to an employer's liability under Title VII.

The Supreme Court has not stated a definitive rule regarding the issue of an employer's liability for hostile environment harassment under Title VII.[7]  However, the Court has advised that agency principles, although not necessarily controlling, should be consulted for guidance.  See Meritor Sav. Bank, supra, 477 U.S. at 72.

In general, an employer will be liable for hostile environment harassment perpetrated by one of its employees if: (1) the employee was acting within the scope of employment; (2) the employer knew or should have known of the hostile environment and failed to take steps reasonably calculated to end the harassment;

_____

[7]The nature of an employer's liability for quid pro quo harassment or other types of sexual discrimination will not be discussed here because they are not at issue.

16

(3) the employee occupied a sufficiently high level in the company that his or her actions could be automatically imputed to the company; or (4) the employee acted under apparent authority from the employer or was aided in accomplishing the harassment by his or her relationship to the employer.[8]

Of the four methods of finding employer liability under Title VII, the most relevant to the case at bar is the second method,[9] which imposes liability "*if* an official representing that institution knew, or in the exercise of reasonable care, should have known, of the harassment's occurrence, *unless* that official can show that he or she took appropriate steps to halt it." Lipsett, supra, 864 F.2d at 901. See also RESTATEMENT (SECOND) OF AGENCY § 219(2)(b) (1958) ("A master is not subject to liability for the torts of his servants acting outside the scope

---

[8]These four general bases of liability represent a composite taken from various sources including the RESTATEMENT (SECOND) OF AGENCY § 219 (1958) and Torres v. Pisano, 116 F.3d 625, 119 WL 290196, at *6 (2d Cir. June 3, 1997); Knabe v. The Boury Corp., 114 F.3d 407, 410-11 (3d Cir. 1997) (citing Bouton v. BMW of North America, Inc., 29 F.3d 103, 106-07 (3d Cir. 1994)); Harrison v. Eddy Potash, Inc., 112 F.3d 1437, 1447 (10th Cir. 1997).

[9]The other three methods do not appear to lend much aid. Obviously, students perpetrating sexual harassment do not act within the scope of employment, nor do they generally occupy high-ranking positions within the hierarchy of the institution. They also cannot be said to act under the apparent authority of the institution or to be aided by their relationship to the "employer."

of their employment, unless . . . the master was negligent or reckless . . . .").

Technically, this basis for employer liability is not a form of vicarious liability at all, but rather is a form of "direct" liability because the employer is liable for its own misconduct in failing to correct known harassment occurring at the workplace.  See, e.g., Davis v. City of Sioux City, 115 F.3d 1365, 1997 WL 329583, at *3-4 (8th Cir. June 18, 1997) (embracing "knew-or-should-have-known" standard to impute liability in hostile environment case because "'in a hostile environment sexual harassment case, the usual basis for a finding of agency will often disappear.  In such cases, the employer should not be held liable unless the employer itself has engaged in some degree of culpable behavior." (quoting Kinman v. Omaha Public School Dist., 94 F.3d 463, 469 (8th Cir.  1996)); Faragher v. City of Boca Raton, 111 F.3d 1530, 1538 (11th Cir. 1997) ("An employer is directly liable for hostile work environment sexual harassment if the employer knew or should have known of the harassment and failed to take prompt remedial action.") (citations omitted); Baker v. Weyerhaeuser Co., 903 F.2d 1342, 1347 (10th Cir. 1990) (holding that plaintiff's sexual harassment claim against employer was based on employer's own conduct, "namely its utter failure through its officers and supervisors to take action against [plaintiff's coworker], a known sexual harasser of

18

females," and was not based on a purported agency relationship between harasser and employer).  Cf. Harrison, supra, note 8, 112 F.3d at 1443-48 (discussing in detail nature of employer's Title VII liability for sexual harassment).

Defendant argues, and some case law supports, that the Title VII/knew-or-should-have-known method of conferring liability on an employer should not be applied to school systems when they fail to prevent sexual harassment between students.  In this court's view, defendant's position is belied by the earlier-quoted section from Franklin, in which the Court looks to Title VII to define the nature of Title IX discrimination.  See Franklin, supra, 503 U.S. at 75.  In addition, it may be significant that the Franklin court cited Meritor with approval. In a discussion of a school official's liability under Title IX for failing to take remedial action to end sexual harassment committed by students and a student-teacher, one court noted,

> Meritor is, of course, the lead Supreme Court case recognizing that an employer may be liable for sexual harassment that creates a hostile work environment.  By citing it with approval in the Title IX context, to define the critical concept of discrimination on the basis of sex, the Supreme Court in Franklin was analogizing the duties of school officials to prevent sexual harassment under Title IX, to those of employers under Title VII.

Oona, R.--S.-- v. McCaffrey, ___ F.3d ___, ___, 1997 WL 458675, at *4 (9th Cir. 1997).  Accordingly, since the duty of a school

19

to its students should correlate with that of an employer to its employees, it makes sense to apply the knew-or-should-have-known standard to the instant action. Otherwise, students would receive less protection from sexual harassment than would employees in the workplace. See Kracunas v. Iona College, ___ F.3d ___, 1997 WL 376912, at *7-8 (2d Cir. June 26, 1997) (extending actual or constructive notice standard "to claims of hostile environment sexual harassment arising under Title IX"); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 250 (2d Cir. 1995) (using actual-or-constructive-notice standard to determine university's Title IX liability to dental student allegedly sexually harassed by patient). Therefore, Title IX provides a remedy to a student who seeks redress from a school district for the district's failure to remedy known harassment perpetrated by other students.

Defendant argues that the knew-or-should-have-known standard is a negligence standard, and therefore is inappropriate for cases brought under Title IX, which provides access to money damages only where intentional misconduct has occurred.

Defendant relies on Rowinsky, which emphasized that Title IX may have been passed pursuant to Congress's spending powers.[10]

---

[10]The Supreme Court has not yet decided whether Title IX was enacted under Congress's Spending Clause powers or section 5 of the Fourteenth Amendment. See Franklin, 503 U.S. at 75 n.8.

20

80 F.3d at 1016. The court reasoned that Title IX should prohibit the conduct of grant recipients themselves, and not acts committed by third parties, such as students. See id. at 1012-13. Otherwise, if Title IX were to extend to acts committed by third parties, it would be difficult for grant recipients to comply with Title IX and receive needed funds. Id. at 1013.

This court agrees with Rowinsky that liability under Title IX should focus on the behavior of the grant recipient, not that of a third party. However, the constructive notice standard is a means of holding an employer or an educational institution directly liable for its own misconduct in failing to stop ongoing intentional discrimination. Accordingly, the court respectfully disagrees that "the possibility of a [Title IX] violation would be so great that recipients would be induced to turn down grants." Id. at 1013.[11]

_____

[11]The court's conclusion is consistent with Franklin v. Gwinnett County School Dist., in which the defendant similarly argued that liability for a teacher's intentional acts would contravene the notice requirement imposed by the Spending Clause.

> The point of not permitting monetary damages for the unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. This notice problem does not arise in a case such as this, in which intentional discrimination is alleged. Unquestionably, Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the bases of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor

21

The First Circuit Court of Appeals has not directly addressed whether constructive notice satisfies the intentionality requirements of a statute passed pursuant to Congress's powers under the Spending Clause. However, the court implicitly sanctioned this method in Lipsett, supra.

In addition, contrary to defendant's argument, a school district's liability will not be open-ended if a constructive notice standard is applied. A school's liability will be limited to situations in which (1) it has actual knowledge of the sexual harassment; (2) the atmosphere at the school is so permeated with harassment that the school must have known of the harassment, see Zimmerman v. Cook County Sheriff's Dep't, 96 F.3d 1017, 1018-19 (7th Cir. 1996) (citing Meritor, supra, 477 U.S. at 72); or (3)

_____

'discriminate[s]' on the basis of sex." Meritor [supra, 477 U.S. at 64]. We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe.

Franklin, supra, 503 U.S. at 74. This aspect of Franklin has generated some confusion among the lower courts and other observers. The idea that a school district receiving federal funds "intentionally discriminates" whenever a teacher creates a hostile environment seems to fly in the face of Meritor v. Vinson, supra, 477 U.S. at 70-73, which rejected the notion that an employee's conduct should be automatically attributed to the employer. However, by citing Meritor, the Franklin court may have been implicitly sanctioning the use of traditional methods of imputing liability (including the agency principles used in Title VII cases) in Title IX cases.

it knew enough underlying facts to support a reasonable conclusion that actionable sexual harassment was occurring. Thus, when properly applied, the standard should not punish educational institutions for mere ineptitude or slight errors in judgment.

A related issue that has generated disagreement among the courts is whether an actual-knowledge standard is more appropriate for policy reasons when cases are brought against public schools. Compare Nicole M. v. Martinez Unified School Sys., 964 F. Supp. 1369, ___, 1997 WL 193919, at *8 (N.D. Cal. Apr. 15, 1997) ("the plain meaning of Title IX and the Franklin decision [have] put school districts on notice that they would be liable for failing to take steps reasonably calculated to end student-on-student hostile environment sexual harassment of which they knew or should have known") and Franks v. Kentucky School for the Deaf, 956 F. Supp. 741, 746-48 (E.D. Ky. 1996) (applying "knew or should have known" standard in case against school district for student-on-student harassment) with Doe v. Londonderry School Dist., supra, 1997 WL 400332 (requiring actual knowledge of harassment before school district can be liable for student-on-student harassment) and Bruneau v. South Kortright Central School Dist., 935 F. Supp. 162, 173 (N.D.N.Y. 1996) (same).

23

The Fifth Circuit has been the most vocal court to come out against a constructive notice standard. See Rosa H. v. San Elizario Indep. School Dist., 106 F.3d 648, 652-61 (5th Cir. 1997) (rejecting constructive notice standard in teacher-student sexual harassment case); Rowinsky, supra, 80 F.3d at 1011-16 (rejecting both constructive notice and actual notice in student-student sexual harassment case).

The Fifth Circuit embraces an "actual knowledge" standard because, in the court's opinion, a school district with knowledge of all the underlying facts should be able to avoid liability if it fails to subjectively understand that the situation involves sexual harassment. See Rosa H., supra, 106 F.3d at 652-61. This court disagrees. When the facts known to the school district are sufficiently egregious to give rise to a claim for sexual harassment, the school district should be expected to recognize the danger and take action before avoiding liability under Title IX.

Accordingly, an educational institution can be liable under Title IX for student-on-student sexual harassment if it knew or should have known of the harassment and failed to take measures reasonably calculated to end it.

c.  Is the school district entitled to summary judgment on the Title IX claim?

24

Drawing on Title VII and Title IX jurisprudence, the court concludes that in order to prove a claim under Title IX against a school district for peer sexual harassment, plaintiffs must establish that: (1) they were students "in an educational program or activity receiving federal financial assistance within the coverage of Title IX," see Doe v. Londonderry, supra, 1997 WL 400332, at *10 (citing Bosley v. Kearney R-1 School Dist., 904 F. Supp. 1006, 1023 (W.D. Mo. 1995)); (2) they were subjected to sexual harassment while participating in the program or activity, see id.; (3) the harassment consisted of offensive gender-based conduct sufficiently severe or pervasive to create an objectively hostile or abusive educational environment and was subjectively perceived by the victim to be abusive, cf. Lattimore, supra, 99 F.3d at 21; and (4) the school district knew or should have known of the harassment and failed to take steps reasonably calculated to end it, see, e.g., Lipsett, supra, 864 F.2d at 901.

The school district's argument at summary judgment focuses solely on the fourth element, the plaintiff's ability to hold the district liable for the acts of John.[12]

---

[12]Specifically, defendant argues that when the evidence is viewed in a light most favorable to the plaintiff, any failure to act on the defendant's part was, at most, the product of negligence, and without evidence of intentional conduct plaintiff cannot prove a Title IX claim. See Defendant's Memorandum at 17.

Jane and Janet claim that they were sexually harassed by John beginning in April of 1993.  See Amended Complaint ¶ 13.  An unsigned letter complaining of the harassment was left in LeClair's mailbox on May 15, 1993.  See Plaintiffs' Exhibit T, ¶ 8.  When nothing was done in response to the letter, the girls then came in person to discuss the matter during the last week of school, June 17, 1993.  See Plaintiffs' Exhibits B, C.  At some point that day, a school employee told the girls not to tell their parents because otherwise the school would be subjected to lawsuits.  See Plaintiffs' Exhibit N at 98-99.

Regardless of whether an actual or a constructive notice standard is applied, a factual dispute exists concerning the school district's knowledge of John's sexual harassment of both Jane and Janet.  On June 17, 1993, the girls met with Puffer, a guidance counselor, two times during the day.  Puffer's notes

26

reveal that the girls complained about conduct that, if true, was sufficiently severe and pervasive to raise the inference that John was "sexually harassing" them, as the term is legally defined. Moreover, John's alleged conduct, which ranged from verbal obscenities to the basest of physical acts, went far beyond anything that should be countenanced in a school setting. See Plaintiffs' Exhibits B, C. The school district's knowledge also can be inferred from other evidence on the record, including the May 1993 letter left by the girls in which they complained of "sexual harassment." Plaintiffs' Exhibit A. The letter described some of the conduct and clearly conveyed that the students were frightened and that the harassment was ongoing. Although unsigned, the letter gave enough identifying information (such as which classes the sexual harassment was happening in) to permit a reasonable person to conclude that LeClair might have discovered the identities of the writers without much effort. Cf. Knabe v. The Boury Corp., supra, 114 F.3d at 413 (explaining that under Title VII "an employer can be held liable if a faulty investigation renders its subsequent remedial action inadequate").

Furthermore, genuine issues of material fact exist regarding whether the girls complained solely on behalf of Jane or on behalf of Janet as well. Compare Affidavit of Stephen LeClair ¶ 6 (attached to defendant's motion) ("I was under the impression

27

that [John's] harassment was targeted solely at [Jane].") with Deposition of Carolyn D. Puffer (attached to plaintiff's motion) ("My memory says that it was a general group experience and there had been some specific things to [Jane].").

The next question regarding the school's liability under Title IX is whether it took steps reasonably calculated to end the harassment. Courts have not yet had occasion to elaborate on what steps a school must take to avoid liability once it becomes aware of ongoing sexual harassment between students. Some of the rules employed in the context of Title VII cases provide helpful guidance to the case at bar. If the school selects an adequate course of action, even if it does not involve punishment, an aggrieved student cannot object to the selected action. See Knabe, supra, 114 F.3d at 414 (discussing employment discrimination situation). The school need not follow the course preferred by the student or the student's parents. Id. All that is required is that the school take steps "reasonably likely" to stop the harassment. Id. (quoting Saxton v. AT&T Co., 10 F.3d 526, 535-56 (7th Cir. 1993)). Moreover, even if the sexual harassment continues, the school could possibly be exonerated if it took reasonable steps to stop the harassment every time it became aware of it.

Applying these general principles to the case at bar, the court has little trouble finding that defendant is not entitled

28

to summary judgment on the issue of whether the school took reasonable steps to end John's harassment of Janet. When the evidence is viewed in a light most favorable to the plaintiffs, the school was on notice of the harassment of Janet as early as May 15, 1993. The school apparently did not address the issue of John's harassment of Janet at the time, nor did it take any reasonable action to ensure that John would not continue to harass Janet in the coming fall year. The school apparently failed to take even the most basic step of alerting the teachers of the classes shared by John and Janet.

The school district will likely argue that it is entitled to summary judgment because Janet may have failed to have complained about John's conduct when it reoccurred in the fall. Cf. Murray v. New York Univ., supra, 57 F.3d at 250-51 (holding in Title IX action that university did not have constructive knowledge of sexual harassment because student failed to notify university that harassment continued following university's reprimand of harasser). Ordinarily, the court would agree. However, in light of the school's arguable failure to properly respond to Janet's complaints the previous spring, as well as the guidance counselor's statement implying that the students should keep quiet because the school feared lawsuits, the jury should decide whether Janet was justified in believing another complaint to the school would have been a futile exercise.

29

With regard to Jane's complaints about the harassment, the school district was more proactive, making its liability much more tenuous. The school took steps both in June and throughout the summer of 1993 to prevent John from continuing to harass Jane. With the agreement of Jane's father, the school procured both a written and a verbal apology from John to Jane, and ensured that John obtained counseling before returning to school in the fall. In addition, the school made some arrangements for John to have enhanced discipline should he misbehave in the fall.[13]

Nonetheless, several factors require that the jury be the ultimate arbiter of the issue. First, given the severity of John's conduct, a question arises as to whether the school's response was reasonably calculated to end the harassment; it is not clear at this stage of the litigation whether John's "punishment fit the crime," so to speak.[14] Second, other factors, including LeClair's apparent failure to investigate the May 15 letter and a guidance counselor's expression of concern

---

[13]Plaintiff argues that the school may have been sloppy in implementing each of these remedies. It also appears that in the fall of 1993 Jane and Jane's parents became unhappy with the school's response and would have preferred greater discipline. However, these facts alone do not persuade the court that the school failed to take adequate steps to remedy the harassment.

[14]In cases involving sexual harassment of a less severe nature, the court suspects that it will be much easier for a school system to show at summary judgment that it took reasonable steps to end it.

30

about "flying" lawsuits, also cast doubt on the reasonableness of the school's response. Accordingly, albeit with some reluctance, the court finds and rules that genuine issues of material fact exist regarding Jane's Title IX claim as well.

d. Does Jane's mother have standing to bring a claim on her own behalf under Title IX?

Defendant argues that Jane Doe's mother lacks standing to assert a claim on her own behalf against the school district under Title IX. Ordinarily, only participants of federally funded programs--and not the participants' parents--have standing to bring claims under Title IX. See, e.g., Burrow, supra, 929 F. Supp. at 1199; Bosley, supra, 904 F. Supp. at 1020; R.L.R. v. The Prague Public School Dist., 838 F. Supp. 1526, 1530 (W.D. Okla. 1993); cf. Jackson v. Katy Indep. School Dist., 951 F. Supp. 1293, 1298 (S.D. Tex. 1996) (holding that parents lacked standing to assert claim for damages under Title VI in their own right, but could bring action in behalf of son). Accordingly, standing concerns preclude Jane's mother from asserting a claim in her own right under Title IX. Her claim is therefore dismissed.

e. Can plaintiffs recover punitive damages under Title IX?

Defendant next argues that it is entitled to summary judgment on plaintiffs' claims for punitive damages under Title

IX.  Title IX does not expressly provide for either compensatory or punitive damages for private litigants.  The Supreme Court has held that Title IX is enforceable through an implied right of action.  Cannon v. University of Chicago, 441 U.S. 677 (1979).  In Franklin, the Court found that a plaintiff asserting a claim for intentional violation of Title IX against a local school district is entitled to a damages remedy.  See Franklin, supra, 503 U.S. at 72-73.  The Court did not specify whether such remedy could include punitive damages, much less whether it includes punitive damages against a municipal entity.

The Franklin court relied on the presumption that once a right of action has been recognized a federal court has the power to award "all appropriate remedies" unless Congress has indicated otherwise.  Id. at 66.  Congress may indicate its intent by statutory language, clear legislative history, or the statutory remedy itself.  See Bush v. Lucas, 462 U.S. 367, 378 (1983).  "In the absence of such a congressional directive, the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation."  Id.

After evaluating both the state of the law at the time of the passage of Title IX and certain post-enactment events, the Franklin Court concluded that Congress had not limited the

private remedies available in Title IX actions.  _Franklin_, _supra_, 503 U.S. at 73.  As of the late nineteenth century, the punitive damages doctrine "was accepted as settled law by nearly all state and federal courts, including [the United States Supreme Court]."  _Smith v. Wade_, 461 U.S. 30, 35 (1983).  Thus, the logical conclusion to be drawn from _Franklin_ is that all remedies, including punitive damages, are available to private litigants under Title IX.[15]

Even assuming that plaintiffs have a general right to seek punitive damages under Title IX, the right may not extend to claims against a municipality, particularly where, as here, only isolated incidents of discrimination on the part of the local government have been claimed.  Absent a specific, contrary indi

---

[15]Following _Franklin_'s endorsement of any appropriate remedy under Title IX, many, but not all, lower courts have recognized that punitive damages awards are available under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 704, a statute whose enforcement regime, as well as legislative history, closely tracks that of Title IX.  _See, e.g._, _Pandazides v. Virginia Bd. of Educ._, 13 F.3d 823, 830-32 (4th Cir. 1994); _Hernandez v. City of Hartford_, 959 F. Supp. 125, 133-34 (D. Conn. 1997); _Kilroy v. Husson College_, 959 F. Supp. 22, 24-25 (D. Me. 1997); _DeLeo v. City of Stamford_, 919 F. Supp. 70, 72-74 (D. Conn. 1995) (recognizing punitive damage remedy for section 504 claim against a city); _Kedra v. Nazareth Hosp._, 868 F. Supp. 733, 739-40 (E.D. Pa. 1994).  _Cf._ _Reich v. Cambridgeport Air Systems, Inc._, 26 F.3d 1187, 1191 (1st Cir. 1994) (relying on _Franklin_ to find that "all appropriate relief" language in subsection of OSHA included exemplary damage awards); _Rodgers v. Magnet Cove Public Schools_, 34 F.3d 642, 642-45 (8th Cir. 1994) ("_Franklin_, therefore, states that Title IX provides a full spectrum of remedies").  _But see_ _Moreno v. Consolidated Rail Corp._, 99 F.3d 782 (6th Cir. 1996) (finding that despite the language in _Franklin_, punitive damages are not available under section 504).

cation from Congress, courts should refrain from interpreting federal statutes as allowing punitive damages awards against municipal entities.  See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 263-64 (1981).  This is because Congress is presumed to have been aware of the longstanding common law rule protecting municipalities from punitive damages awards.  See id. at 258.

Review of the text of Title IX and the context in which it and Title VI (which Title IX was modeled after) were enacted provides scant evidence that Congress intended to disturb the immunity to punitive damages enjoyed by local governing bodies. To the contrary, in Cannon, when the Supreme Court first recognized an implied right of action under Title IX, it did so, in part, to alleviate the burdens placed on grant recipients by the harsh sanctions inherent in the then-existing statutory procedures for cutting off federal funding.

Congress passed Title IX in 1972 in order to accomplish two objectives: (1) to avoid the use of federal resources to support discriminatory practices; and (2) to provide individual citizens with effective protection against those practices.  See Cannon, supra, 441 U.S. at 704.  To effectuate the first purpose, Congress provided a statutory procedure for the termination of federal financial support for offending institutions.  See id. at 704.  Given the harshness and severity of cutting off federal

34

funding to a grant recipient, some members of Congress believed that private lawsuits would provide a less burdensome and more efficient alternative, particularly when isolated violations have occurred.

> [The remedy of terminating federal funding] is, however, severe and often may not provide an appropriate means of accomplishing the second purpose if merely an isolated violation has occurred. In that situation, the violation might be remedied more efficiently by an order requiring an institution to accept an applicant who had been improperly excluded. Moreover, in that kind of situation it makes little sense to impose on an individual, whose only interest is in obtaining a benefit for herself, or on HEW, the burden of demonstrating that an institution's practices are so pervasively discriminatory that a complete cut-off of federal funding is appropriate. The award of individual relief to a private litigant who has prosecuted her own suit is not only sensible but is also fully consistent with--and in some cases even necessary to--the orderly enforcement of the statute.

Id. at 704-05. The remedy of a private lawsuit was considered by some members of Congress as a means of protecting grant recipients from more onerous sanctions.

> "Personally, I think it would be a rare case when funds would actually be cut off. In most cases alternative remedies, principally lawsuits to end discrimination, would be the preferable and more effective remedy. If a Negro child were kept out of a school receiving Federal funds, I think it would be better to get the Negro child into school than to cut off funds and impair the education of the white children."

35

<u>Id.</u> at 704-05 n.38 (quoting 110 Cong. Rec. 7067 (1964) (Sen Ribicoff).[16]

The <u>Cannon</u> court makes another interesting observation.  An earlier version of Title VI simply permitted federal agencies to withhold funds from offending recipients and does not even implicitly refer to an individual right against discrimination. <u>See</u> <u>Cannon</u>, <u>supra</u>, 441 U.S. at 716 n.51.  Title VI, in its final form, is far more conducive to a private right of action; however, it "was arguably less conducive to implication of a private remedy against the Government (as well as the recipient) to compel the cutoff of funds."  <u>Id.</u>  This compromise may indicate that Congress was leery of giving private litigants the power to threaten grant recipients with large, punitive sanctions.

Finally, even under the administrative scheme created to enforce Title VI (and, by extension, Title IX), the punitive-like sanction of terminating federal funding was considered a remedy

---

[16]Echoing this concern, an opponent of Title VI stated,

> "Why does the Senator rely on the court's
> authority [under the Fourteenth Amendment],
> instead of giving arbitrary, capricious, wholesale
> punitive power to some Federal bureaucrat to
> starve entire cities, towns, States, and regions
> at one fell swoop?"

<u>Id.</u> at 710 (quoting 110 Cong. Rec. 5254 (1964) (Sen. Talmadge).

36

of last resort, to be used only when other, more resourceful

means of ending the discrimination proved to be unworkable.

> "[Title VI] encourages Federal departments and
> agencies to be resourceful in finding ways of
> ending discrimination voluntarily without forcing
> a termination of funds needed for education,
> public health, social welfare, disaster relief,
> and other urgent programs. Cutoff of funds needed
> for such purposes should be the last step, not the
> first, in an effective program to end racial
> discrimination."

Cannon, supra, 441 U.S. at 721-22 (White, J., dissenting)

(quoting 110 Cong. Rec. 6546 (1964)).

The court expresses no opinion about whether this very

limited legislative history analysis has any bearing on punitive

damages claims in general under Title IX. It does indicate,

however, that Congress was sensitive to the financial

difficulties of grant recipients and that it demonstrated no

intention of disturbing the common law rule that municipalities

are entitled to immunity from punitive damages.[17]

---

[17]However, in the rare case in which a local public school
district has demonstrated complete indifference to the
requirements of Title IX and has committed ongoing egregious
violations
with no sign of relenting, a federal court might determine, in
its discretion, that a punitive damages remedy for a private
party is the best, or only, means of forcing the school district
into compliance. In such a case, the public policies underlying
municipal immunity might give way in favor of the federal
government's overriding interest in preventing its funds from
being spent on discriminatory practices. The circumstances
alleged in the present action against defendant are such that the
court need not address the issue.

Plaintiffs might respond by relying on the Rehabilitation Amendments Act of 1986 (also known as "The Civil Rights Equalization Act"), Pub. L. 99-506, 100 Stat. 1845, codified at 42 U.S.C. § 2000d-7. The Amendments Act abrogates the states' Eleventh Amendment immunity from suit brought under Title IX, Title VI, section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975. The Act expressly provides that states would be liable to the same extent as public or private entities under these statutes.

> In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

42 U.S.C. § 2000d-7(a)(2). Plaintiffs might argue that with this section Congress demonstrated its intention that municipalities stand on an equal footing with private defendants. Thus, in addition to abrogating the states' sovereign immunity, Congress arguably also dispensed with municipal immunity to punitive damages.

In addition to explicitly abrogating the states' Eleventh Amendment immunity, Congress's implicit purpose in enacting the Rehabilitation Amendments Act was to validate, for the first time, the use of traditional, common law remedies in Title IX actions. See Franklin, supra, 503 U.S. at 72-73. Of course, in

38

light of <u>Newport</u>, remedies "at law or in equity," do not include punitive damages awards against municipalities. Accordingly, since this provision is susceptible to different interpretations, it is not clear whether Congress intended to disturb the immunity traditionally enjoyed by local governing bodies.

Fortunately, the court need not decide this nettlesome question because defendant is entitled to summary judgment on the alternative ground that the evidence does not support the inference that punitive damages are warranted in this case.

Punitive damages are awarded as a matter of public policy for the purpose of either punishing the defendant or deterring others from engaging in similar conduct in the future. <u>McKinnon v. Kwong Wah Restaurant</u>, 83 F.3d 498, 508 (1st Cir. 1996). Not all intentional torts are eligible for punitive damages awards. <u>See</u> <u>id.</u> at 509. Instead, the plaintiff must show that defendant acted outrageously, because of defendant's evil motive or reckless indifference to the rights of others. <u>Id.</u> at 509 (citing <u>Hernandez-Tirado v. Artau</u>, 874 F.2d 866, 869 (1st Cir. 1989)).

To support the need for punitive damages, Janet outlines a series of missteps made by different individuals within the ranks of the school district. Except for one comment made by a guidance counselor at the very end of the girls' seventh grade year, there is little to no evidence that the officials at the

39

school district acted with malicious intent.  Also, although the school

district may have failed to take appropriate action to end the harassment, it does not appear that it acted with reckless indifference to plaintiffs' rights in this regard.  The Office for Civil Rights did not determine that peer sexual harassment even constitutes a violation of Title IX until 1997.  <u>See</u> Office for Civil Rights, <u>Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties</u>, 62 Fed. Reg. 12,034 (1997) (final policy guidance).  Likewise, judicial recognition of this type of violation is also of very recent vintage.

Plaintiffs' claims for punitive damages under Title IX must therefore be dismissed.


<u>3.  The Section 1983 Claim</u>

Defendant next asserts that it is entitled to summary judgment on plaintiffs' claims brought pursuant to 42 U.S.C. § 1983.

Plaintiffs base their section 1983 claim on the school district's failure to take action to protect Jane and Janet from the abuse perpetrated by John.  They claim that the school's duty to protect them arose out of the special relationship between the girls and the school and that breach of this duty constitutes a violation of their Due Process rights.

Under the Constitution, the state has an affirmative duty to care for and protect private individuals only under certain limited circumstances. See DeShaney v. Winnebago County Dep't of Social Services, 489 U.S. 189, 198 (1989). Such duty can arise when "the State takes a person into its custody and holds him there against his will." Id. at 199. Crucial to the inquiry is whether the state has taken an affirmative act of restraining the individual from acting on his own behalf. See id. Cf. Monahan v. Dorchester Counseling Center, 961 F.2d 987, 990-92 (1st Cir. 1992) (rejecting Due Process claim of patient who had voluntarily committed himself to care of Department of Mental Health). Plaintiffs provide no evidence sufficient to support the inference that at any point they participated in the public school system against their will, much less that the school istrict took any affirmative action to prevent them from protecting themselves. See, e.g., Doe v. Londonderry, supra, 1997 WL 400332, at *13 (rejecting section 1983 claim of public school student); Dorothy J. v. Little Rock School Dist., 7 F.3d 729, 732 (8th Cir. 1993) (rejecting Due Process claim because state-mandated school attendance does not render a child's guardians unable to care for the child's basic needs). Accordingly, defendant is entitled to summary judgment on plaintiffs' section 1983 claims.

## Conclusion

41

Defendant's motion for summary judgment (document 16) is granted as to the following claims: (1) Jane's mother's Title IX claim; (2) the section 1983 claim in its entirety; and (3) plaintiff's claim for punitive damages under Title IX. Defendant's motion for summary judgment is otherwise denied.

Defendant's motion to dismiss (document 15) is denied as moot because it has been treated as part of the motion for summary judgment.

Finally, the court grants plaintiffs' motion to amend the complaint (document 19) to add new factual allegations. However, the three categories of claims mentioned above shall remain dismissed.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

August 25, 1997

cc:   All Counsel

42