177 P.3d 724 (2008)
S.S., Appellant, and
P.L., Plaintiff,
v.
Roc ALEXANDER, Defendant, and
University of Washington, Respondent.
No. 58335-2-I.
Court of Appeals of Washington, Division 1.
February 11, 2008.
*728 Rebecca Jane Roe, Attorney at Law, Seattle, WA, for Appellant.
Andrew George Cooley, Attorney at Law, Seattle, WA, for Respondent.
DWYER, J.
¶ 1 S.S., a former undergraduate student at the University of Washington who was also employed by the UW's athletic department as a student assistant equipment manager for the UW football team, appeals from a superior court order granting summary judgment dismissal of her claims against the university. S.S. alleges that she was raped in her UW dormitory room by Roc Alexander, who at that time was a fellow student and a member of the football team. S.S. further alleges that the actions of UW officials following her report of the rape, coupled with the trauma of the rape, deprived her of her right to be free from sex discrimination in education programs, thus violating Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, and deprived her of her civil rights, a claim cognizable under 42 U.S.C. § 1983.[1] After an exhaustive review of relevant decisional authority and a thorough review of the trial court record, we conclude that S.S. put before the superior court sufficient evidence to warrant the submittal of her Title IX claim to a jury. Accordingly, we reverse the decision of the superior court and remand this matter to that court for further proceedings.

I.

Facts[2]
¶ 2 In autumn of 2000, 18-year-old S.S. began attending the UW as an undergraduate freshman. The summer before classes commenced, she moved into freshman housing on the UW campus and began working in a highly-coveted position as a student assistant equipment manager for the UW's varsity football team, a position she had also held with her high school team. After the conclusion of the football team's regular season, *729 while the team was engaged in a practice period leading up to the January 1, 2001 Rose Bowl game, S.S. became involved in a consensual sexual relationship with Roc Alexander, another student at the UW and a key player on the football team.
¶ 3 During the course of' their relationship, S.S. began to find Alexander's conduct toward her increasingly demeaning. For example, Alexander would express interest in having sex with S.S.'s roommate, open and leave open the door of S.S.'s dormitory room while S.S. was undressed after intercourse, and wipe off his genitalia after intercourse with items of clothing belonging to S.S. Once, after having sex in a dormitory study room, Alexander ejaculated onto S.S.'s back and then refused to wipe off the ejaculate, knowing that this would require S.S. to either walk back to her room in that state or use her clothes to clean herself and then have to wear them during her walk to her room. On another occasion, Alexander "whipped out his penis and stuck it in [S.S.'s] face" in the presence of another male who was in. Alexander's room watching television.
¶ 4 During their last consensual sexual encounter, Alexander raised his hand to S.S. in a threatening manner. S.S. ended their relationship as a result of that incident.
¶ 5 Days after the relationship ended, Alexander forcibly pushed his way into S.S.'s dormitory room, removed her clothing, and had penile-vaginal intercourse with her against her will and despite her verbal protest.
¶ 6 After the incident, S.S. "felt raped" but did not know "if it was legally a rape or not" and so did not immediately report the rape to anyone because she "just wanted to forget what happened." S.S. continued her work with the football team, a position that would occasionally expose her to contact with Alexander, believing that she should not have to sacrifice her employment as a result of Alexander's actions. However, she avoided social contact with Alexander and other football team members for the remaining portion of that school year.
¶ 7 The next summer, 2001, S.S. again began working as a student assistant equipment manager for the football team in preparation for the upcoming season. While socializing at a training camp for equipment managers, trainers, and coaches, assistant coach Pete Kaligis asked S.S. if she had ever been sexually assaulted by a football player. S.S. became emotionally upset, answered in the affirmative, and identified Alexander as her assailant. Kaligis did not present or suggest to S.S. any specific options for dealing with the incident.
¶ 8 Approximately two weeks later, S.S. was approached by Tony Piro, the equipment manager for the football team and S.S.'s supervisor. Piro asked S.S. if she would like to speak with the head football coach about the incident. S.S. answered in the negative. Piro did not present or suggest to S.S. any other options for dealing with the incident.
¶ 9 S.S. was subsequently approached by Dave Burton, the UW's associate athletic director, and Piro's supervisor.[3] Burton brought S.S. into a meeting with Marie Tuite, the assistant athletic director and Burton's supervisor. At the meeting, S.S. told Tuite and Burton that Alexander had "violated" her. In response to her allegation, Tuite and Burton suggested that S.S. transfer away from her position with the football team. Burton warned S.S. that members of the football team would likely harass S.S. should they find out about the rape, and Tuite stated that, if S.S. stayed on the football team and it was revealed that S.S. was raped by a member of the team, "it would reflect poorly on the University of Washington's handling of the situation." S.S. stated that she did not wish to leave her job with the football program.
¶ 10 Tuite offered to arrange a small number of counseling sessions for S.S. and told S.S. that some kind of action would occur to redress her complaint. Neither Tuite nor Burton presented or suggested any other specific options to S.S. for dealing with the incident.
*730 ¶ 11 S.S. did not hear anything more from Tuite or any other member of the athletic department for several days or weeks. She then returned to Tuite's office and expressed an interest in filing a police report. Tuite stated that she was working on a solution and specifically told S.S. to wait. Again, Tuite did not present or suggest any specific options to S.S.
¶ 12 Tuite then contacted her direct supervisor, athletic director Barbara Hedges, and Helen Remick, the school's designated Title IX compliance officer. Remick referred Tuite to Lois Price-Spratlen, the UW's ombudsman.[4] Hedges, Tuite, and Price-Spratlen then met to determine how to proceed in regard to S.S.'s allegation. At that meeting, the three women decided that Price-Spratlen would conduct a mediation between S.S., the alleged rape victim, and Alexander, her alleged rapist.
¶ 13 A day or two after that decision was made, Burton again approached S.S. and brought her to meet with Price-Spratlen. Once S.S. arrived at Price-Spratlen's office she was asked to fill out an intake form, upon which she identified the reason for her visit as "date rape." During S.S's meeting with Price-Spratlen, Price-Spratlen told S.S. about the mediation process that had been planned.
¶ 14 Despite the existence of other on-campus and off-campus resources available to victims of rape and sexual assault, Price-Spratlen did not present or suggest to S.S. any options for dealing with the situation other than the mediation.[5] Price-Spratlen also told S.S. that she had already met with Alexander, and that he "was really sorry and that he'd cried in front of [Price-Spratlen]," thereby implying that Alexander would be cooperative at the planned mediation. While S.S. knew "in a sense" that her participation in the mediation was voluntary, she also stated: "[I]t was my employer who was encouraging this. So, I didn't know what would happen if I didn't go through the mediation, what sort of other resolution there would be."
¶ 15 S.S. had two subsequent meetings with Price-Spratlen. S.S. gave Price-Spratlen detailed accounts of the rape, both verbally and in writing. There is no indication in the record, however, that any person from Price-Spratlen's office, any person from the athletic administration, or any other university official ever investigated the circumstances surrounding S.S.'s complaint to determine the truth of her allegation.
¶ 16 On the evening of October 1, 2001, a three-hour mediation took place in Price-Spratlen's office. S.S., the student-employee alleged rape victim, Alexander, the student-football player alleged rapist, Price-Spratlen, the UW ombudsman, and Tuite, the assistant athletic director, were all present at the mediation. During the mediation, S.S. expressed her desire that Alexander be suspended from participation in several football games. Alexander denied S.S.'s rape allegation and threatened that he would leave the *731 UW if he were suspended from any football games. Tuite refused to consider suspending Alexander, stating that the media "would ask why he was not playing." At the conclusion of the mediation, Tuite and Price-Spratlen decided that Alexander would undergo counseling and perform community service.
¶ 17 S.S. was not satisfied with the mediation's outcome, believing that she was not provided the opportunity to discuss most of the issues she wished to discuss, and that referring Alexander for counseling and community service work was a sanction not commensurate with the seriousness of the rape she had suffered. She further suspected that Tuite and Price-Spratlen were biased in Alexander's favor and that Tuite was attempting to protect the football program from public embarrassment.
¶ 18 After the mediation, S.S. approached Price-Spratlen and expressed her dissatisfaction with the outcome of the mediation. In response, Price-Spratlen asked S.S. if she was "making everything up." Price-Spratlen then told S.S. that a different outcome would require another mediation session. Again, Price-Spratlen did not suggest or present any other options to S.S.S.S. decided not to undergo an additional mediation, believing that Alexander would not admit what he had done in front of UW officials and that Price-Spratlen's office was "trying to sweep [her] complaint under the rug and avoid negative publicity for the athletic department."
¶ 19 S.S. subsequently spoke to Tuite and again expressed dissatisfaction with the outcome of the mediation. Tuite did not present or suggest to S.S. any other options for dealing with the incident.
¶ 20 Price-Spratlen called S.S. into a meeting a few days after S.S. had expressed her dissatisfaction to Price-Spratlen regarding the mediation's outcome. At the meeting, Price-Spratlen instructed S.S. to fill out and sign a form entitled "Client Plan." Price-Spratlen dictated statements that she instructed S.S. to write down on the form, including the following: "I have spoken with Roc Alexander and we have discussed all of the issues I wanted to cover with him," "His responses to our conversation were satisfactory to me," and Marie Tuite "will communicate this info. to Barbara Hedges. I consider this matter closed."
¶ 21 Later that year, S.S. again approached Tuite and stated that she had heard of a rape perpetrated by Alexander against another female student. Tuite responded that she had also heard of the alleged rape, but declined to take any further action, explaining that "they could not punish him for something he had already been punished for."
¶ 22 S.S. subsequently approached Burton to express her concern that Alexander was not fulfilling the obligations imposed on him pursuant to the mediation. Burton responded by again suggesting that S.S. transfer away from her job with the football team. Burton did not suggest or present to S.S. any other options for dealing with the incident. S.S. chose to retain her student employment with the football program, explaining that she "refused to let this incident force [her] to leave."[6]
¶ 23 As a result of the mediation, which S.S. felt had "almost completely vindicated Roc Alexander," S.S. experienced feelings of hopelessness and helplessness, found it difficult to concentrate on her studies, and felt angry and upset whenever she had contact with Roc Alexander throughout the course of her sophomore year. S.S. also found it hard to concentrate on her studies and applied for and received a hardship deferment for one class. S.S. would speak to her roommate on an almost-daily basis that year about the rape, the mediation, and the difficulty of being in Alexander's presence. S.S. also sought the assistance of a counselor, who met with her for 64 sessions beginning in early *732 2003. The counselor reported that S.S. suffered from anxiety and depression related both to being sexually assaulted and to the mediation process, which she felt had trivialized her experience.[7]
¶ 24 During 2003, S.S. participated in an on-campus rape education training session in which the director of the sexual assault and relationship violence program (SARIS), an on-campus rape assault referral and advocacy group, stated that mediation is an inappropriate means of dealing with sexual assault.[8] S.S. subsequently contacted the UW's on-campus legal services office, where she learned that another woman, P.L., had raised a similar rape allegation against Alexander.[9]
¶ 25 On February 27, 2004, S.S. filed this suit against the university asserting that the UW's actions violated Title IX of the Education Amendments of 1972. The UW moved for summary judgment. The trial court granted the motion.
¶ 26 This appeal followed.

II.

Preliminary Matters
Standard of review
¶ 27 "We engage in a de novo review of a ruling granting summary judgment. Anderson v. Weslo, Inc., 79 Wash.App. 829, 833, 906 P.2d 336 (1995). Thus, we engage in the same inquiry as the trial court." Green v. Normandy Park, Riviera Section, Cmty. Club, Inc., 137 Wash.App. 665, 681, 151 P.3d 1038 (2007). "Summary judgment is properly granted when the pleadings, affidavits, depositions, and admission on file demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); Hutchins v. 1001 Fourth Ave. Assocs., 116 Wash.2d 217, 220, 802 P.2d 1360 (1991)." Green, 137 Wash.App. at 681, 151 P.3d 1038. "All reasonable inferences from the evidence must be construed in favor of the nonmoving party. Lamon v. McDonnell Douglas Corp., 91 Wash.2d 345, 349, 588 P.2d 1346 (1979)." Green, 137 Wash.App. at 681, 151 P.3d 1038.
*733 Federal case authority
¶ 28 Title IX is an enactment of the United States Congress. The issues presented for resolution in this case thus involve our analysis of federal questions. In resolving the issues presented, we are mindful that "[t]he statute being a federal one, we are, of course, bound by the construction placed upon it by the Supreme Court of the United States." N. Pac. Ry. Co. v. Longmire, 104 Wash. 121, 125, 176 P. 150 (1918).
¶ 29 We have greater latitude when analyzing the decisions of the various federal appellate courts. "When a Federal statute is constructed by a United States court of appeals, such construction is entitled to great weight with us when the same statute is involved in a case we are considering, but it is not binding on us if we do not deem it logical or sound." Home Ins. Co. of New York v. N. Pac. Ry. Co., 18 Wash.2d 798, 808, 140 P.2d 507 (1943). Moreover, the "geographical location of the court issuing the opinion is of no moment. "We have never held that an opinion from the Ninth Circuit is more or less persuasive than, for example, the Second, Sixth, Seventh, Eighth, or Tenth Circuits." In re Pers. Restraint of Markel, 154 Wash.2d 262, 271 n. 4, 111 P.3d 249 (2005). Thus, we are properly guided by the principles of law announced in the most well-reasoned of the decisions we have reviewed. We are not, however, bound to follow a holding of a lower federal court merely because it was announced as such.
¶ 30 The utility of unpublished federal court decisions presents yet another vexing concern. In their briefing, each party has cited such decisions and we have reviewed these decisions, as well as others. Our own rules do not allow for the citation of our own unpublished decisions to us. RAP 10.4(h).
¶ 31 In deciding the federal questions presented to us, however, it is sensible that we should apply the same body of decisional law as would be applied in a federal court charged with deciding identical issues. On January 1, 2007, the United States Supreme Court adopted Federal Rule of Appellate Procedure 32.1, which permits citation to unpublished decisions as persuasive authority and, by inference, authorizes the circuit courts to reference these decisions as authority in their opinions. Fed. R.App. P. 32.1 applies to unpublished decisions filed on or after January 1, 2007.
¶ 32 As to unpublished decisions filed prior to that date, each circuit court has its own rule. The majority of the circuit courts, however, now allow for the unrestricted citation of these decisions. The other circuit courts allow for such citations in more limited circumstances.
¶ 33 We will apply the majority approach and cite to unpublished federal court decisions where appropriate. However, no issue will be decided solely on the basis of such authority.

III.

The Identification and Delineation of the Title IX Private Right of Action
¶ 34 S.S.'s claim is premised upon "Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U.S.C. § 1681 et seq." Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 632-33, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).
Title IX provides, with certain exceptions not at issue here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).
Davis, 526 U.S. at 638, 119 S.Ct. 1661.
¶ 35 Although no private right of action is explicitly set forth in the statute, the United States Supreme Court
held in Cannon v. University of Chicago, 441 U.S. 677[, 99 S.Ct. 1946, 60 L.Ed.2d 560] (1979), that Title IX is also enforceable through an implied right of action . . . [and] subsequently established in Franklin v. Gwinnett County Public Schools, 503 U.S. 601, 112 S.Ct. 1028, 117 L.Ed.2d 208] (1992), that monetary damages are available in the implied private action.
*734 Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 281, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).
¶ 36 In Franklin, in addition to clarifying that damages were available as a Title IX private action remedy, the Court confirmed that acts of teacher-student sexual harassment fell within the ambit of Title IX:
Unquestionably, Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor `discriminate[s]' on the basis of sex." Meritor Say. Bank, FSB v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student.
Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (alteration in original).
¶ 37 "Title IX was enacted as an exercise of Congress' powers under the Spending Clause."[10]Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 181, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005); Davis, 526 U.S. at 640, 119 S.Ct. 1661. "When Congress acts pursuant to its spending power, it generates legislation `much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'" Davis, 526 U.S. at 640, 119 S.Ct. 1661 (quoting Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)).
¶ 38 Thus, in Franklin, the Court noted that imposing liability for a Title IX violation premised upon unintentional conduct was inconsistent with the requirements of the Spending Clause. Franklin, 503 U.S. at 74, 112 S.Ct. 1028. "The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award." Franklin, 503 U.S. at 74, 112 S.Ct. 1028. In Franklin, however, where the allegations were that school officials were aware that a student was being sexually harassed by a teacher who also served as a sports coach and that school administrators discouraged the student from "pressing charges" against the teacher, 503 U.S. at 63-64, 112 S.Ct. 1028, the Court saw no such impediment. "This notice problem does not arise in a case such as this, in which intentional discrimination is alleged." Franklin, 503 U.S. at 74-75, 112 S.Ct. 1028.
¶ 39 The Supreme Court revisited the relationship between Title IX and teacher-student sexual harassment six years later. In Gebser, the Court determined that it would be inconsistent with the Spending Clause origins of Title IX to impose damages liability on funding recipients based on principles of constructive notice or respondeat superior liability. Gebser, 524 U.S. at 285, 118 S.Ct. 1989. Instead, the Court concluded "that damages may not be recovered . . . unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." Gebser, 524 U.S. at 277, 118 S.Ct. 1989. The Court stated this rule more broadly later in the opinion:
[A] damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to initiate corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.
Gebser, 524 U.S. at 290, 118 S.Ct. 1989.
¶ 40 The following year, the Supreme Court, for the firstand onlytime addressed the interplay between peer (student-on-student) sexual harassment and Title IX. Specifically, in Davis, the Court addressed "the question whether a recipient of federal education funding may be liable for damages under Title IX under any circumstances for discrimination in the form of student-on-student sexual harassment." Davis, 526 U.S. at 639, 119 S.Ct. 1661 (emphasis added). As the Court defined its task. "We must determine whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money *735 damages." Davis, 526 U.S. at 639, 119 S.Ct. 1661.
¶ 41 In Davis, the Title IX claim was brought on behalf of a fifth grade girl who had been subjected to repeated acts of sexual harassment by a fifth grade male classmate. Despite the girl's protests to three of her teachers, her attempt to meet with the school principal (which was rebuffed), and her parent's intercession with the principal, no disciplinary action was taken against the boy. Instead, the principal asked the girl's mother why her daughter "was the only one complaining." Davis, 526 U.S. at 635, 119 S.Ct. 1661.
¶ 42 Against this factual backdrop, the Supreme Court directly faced the question of whether a Title IX action for damages could be predicated upon acts of peer sexual harassment. The Court began its analysis by acknowledging that "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct." Davis, 526 U.S. at 640, 119 S.Ct. 1661. The Court noted that the student's claim was properly directed.
We disagree with [the school board's] assertion, however, that [the plaintiff] seeks to hold the Board liable for [the boy's] actions instead of its own. Here [the plaintiff] attempts to hold the Board liable for its own decision to remain idle in the face of known student-on-student harassment in its schools.
Davis, 526 U.S. at 641, 119 S.Ct. 1661 (emphasis added). The basis for the Court's disagreement was a premise underlying its decision in Gebser:
[T]he theory in Gebser was that the recipient was directly liable for its deliberate indifference to discrimination. Liability in that case did not arise because the "teacher's actions [were] treated" as those of the funding recipient; the district was directly liable for its own failure to act.
Davis, 526 U.S. at 645-46, 119 S.Ct. 1661 (citations omitted).
¶ 43 The Court concluded "that recipients of federal funding may be liable for `subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." Davis, 526 U.S. at 646-47, 119 S.Ct. 1661 (alteration in original). The Court noted that "[d]eliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action." Davis, 526 U.S. at 644, 119 S.Ct. 1661. Thus, "the harassment must take place in a context subject to the school district's control." Davis, 526 U.S. at 645, 119 S.Ct. 1661.
¶ 44 The Court also discussed the meaning of the term "deliberate indifference" in the Title IX context. "[F]unding recipients are deemed `deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of known circumstances." Davis, 526 U.S. at 648, 119 S.Ct. 1661. Stated differently, the recipient must "respond to known peer harassment in a manner that is not clearly unreasonable." Davis, 526 U.S. at 649, 119 S.Ct. 1661.
¶ 45 The Court summed up its decision thusly:
Students are not only protected from discrimination, but also specifically shielded from being "excluded from participation in" or "denied the benefits of" any "education program or activity receiving Federal financial assistance." § 1681(a). The statute makes clear that, whatever else it prohibits, students must not be denied access to educational benefits and opportunities on the basis of gender. We thus conclude that funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.
Davis, 526 U.S. at 650, 119 S.Ct. 1661. A total denial of access is not required to state a claim. Rather, the sexual harassment *736 must be of sufficient severity that it "so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." Davis, 526 U.S. at 651, 119 S.Ct. 1661. The focus is on a denial of "the equal access to education that Title IX is designed to protect." Davis, 526 U.S. at 652, 119 S.Ct. 1661.

IV

Formulations of the Elements of a Title IX Cause of Action for Damages Following Davis
¶ 46 Following the Supreme Court's decision in Davis, the lower federal courts commenced announcing various formulations of what were termed the "elements" of a Title IX cause of action for damages premised upon peer sexual harassment. One of the earliest, and most often cited, formulations is that such a claim properly exists
when the plaintiff can demonstrate the following elements:
(1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school,
(2) the funding recipient had actual knowledge of the sexual harassment, and
(3) the funding recipient was deliberately indifferent to the harassment.
Vance v. Spencer County Pub. Sch. Dist., 231 F.3d 253, 258-59 (6th Cir.2000) (quoting Soper v. Hoben, 195 F.3d 845, 854 (6th Cir. 1999)). In addition, the plaintiff must prove that the defendant was a recipient of federal education funding. Vance, 231 F.3d at 258.
¶ 47 More recently, a different circuit court announced a slightly different formulation:
A plaintiff seeking recovery for a violation of Title IX based on student-on-student harassment must prove four elements. First, the defendant must be a Title IX funding recipient. Second, an "appropriate person" must have actual knowledge of the discrimination or harassment the plaintiff alleges occurred. "An `appropriate person' . . . is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." Third, a funding recipient is liable for student-on-student harassment only if "the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." In considering this element, we analyze the conduct of the funding recipient, not the alleged harasser. . . . Fourth, the discrimination must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."
Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1293 (11th Cir.2007) (citations omitted).
¶ 48 A six-element formulation has also been utilized by various federal courts. Pursuant to this formulation, the first element is that the claim be brought against a funding recipient. Then,
funding recipients are properly held liable in damages where they are: (1) deliberately indifferent, (2) to sexual harassment, (3) of which they have actual knowledge, (4) that is so severe, pervasive, and objectively offensive, (5) that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.
Ray v. Antioch Unified Sch. Dist., 107 F.Supp.2d 1165, 1168 (N.D.Cal.2000) (citing Davis, 526 U.S. at 650, 119 S.Ct. 1661).
¶ 49 Yet another formulation has been announced by yet another circuit court:
To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.
Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir.2007) (en banc). This formulation is similar to one previously adopted by the First Circuit Court of Appeals. See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir.2002).
*737 ¶ 50 What should we make of the existence of these various formulations? Simply this: When courts refer to the "elements" of a Title IX claim, they are not using the term in the same way as if they were referring to the "elements" of a criminal offense. In the latter circumstance, the elements would be set forth in the statute defining the crime enacted by Congress or the state legislature. Here, the cause of action is implied; Congress did not set forth the elements. Rather, the various "tests" formulated are based on statements in judicial opinions. In the end, unlike the words used in a criminal statute, it is not the words used in the various judicial opinions that direct our analysis. Instead, it is the ideas and concerns expressed constitutional and otherwisethat we must take care to fully address in resolving the difficult issues presented to us.

V.

The UW is a Recipient of Federal Educational Funding
¶ 51 The parties agree that the UW is a recipient of federal education funding assistance. The UW, therefore, must act in compliance with Title IX.

VI.

Sexual Harassment is Sex Discrimination and S.S. Established that She Suffered Sexual Harassment
¶ 52 "`[S]exual harassment' is `discrimination' in the school context under Title IX." Davis, 526 U.S. at 650, 119 S.Ct. 1661. "There is no dispute that student-on-student sexual assault can constitute sexual harassment for Title IX purposes." Doe v. Derby Bd. of Educ., 451 F.Supp.2d 438, 444 (D.Conn.2006) (citing Soper, 195 F.3d at 855 (victim's allegations of rape and sexual abuse qualify as severe, pervasive, and objectively offensive sexual harassment)).
Rape is unquestionably among the most severe forms of sexual harassment. . . . It imports a profoundly serious level of abuse into a situation that, by law, must remain free of discrimination based on sex. Being raped is, at minimum, an act of discrimination based on sex.
Little v. Windermere. Relocation, Inc., 301 F.3d 958, 967-68 (9th Cir.2002).
¶ 53 S.S. presented a great deal of evidence in support of her claim that she was raped by Alexander. The requirements of this element of her Title IX cause of action are met. See Doe v. Green, 298 F.Supp.2d 1025, 1034 (D.Nev.2004) ("[A] complaint of harassment need not be undisputed or I ]corroborated before it can be considered to fairly alert the school district of the potential for sexual harassment.").

VII.

Appropriate UW Officials Had Knowledge of the Discrimination
¶ 54 The Title IX "private right of action extends only to claims against the educational institution itself." Frazier, 276 F.3d at 65. To establish a Title IX claim, the plaintiff must show that an appropriate official was aware of the discrimination and then failed to reasonably respond. "An `appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." Gebser, 524 U.S. at 290, 118 S.Ct. 1989. Whether a particular employee is an "appropriate person" is necessarily a fact-based inquiry.
¶ 55 Certain observations are germane to the inquiry, however.
With respect to harassment by teachers or staff, application of the Supreme Court's requirement of actual notice to an official with authority to address the discrimination and to initiate corrective measures results in a limited and readily identifiable number of school administrators. However, a much broader number of administrators and employees could conceivably exercise at least some control over student behavior.
Hawkins v. Sarasota County Sch. Bd., 322 F.3d 1279, 1287 (11th Cir.2003). In cases of peer sexual harassment, it remains an "open" question as to whether knowledge of the discrimination by a classroom instructor constitutes knowledge by the funding recipient. Hawkins, 322 F.3d at 1286. In such cases, *738 however, knowledge by an assistant principal, Seiwert v. Spencer-Owen Cmty. Sch. Corp., 497 F.Supp.2d 942 (S.D.Ind.2007), a Title IX coordinator, Vance, 231 F.3d 253, an affirmative action officer or a dean, Morse v. Regents of Univ. of Colo., 154 F.3d 1124 (10th Cir.1998), and a university lawyer ("an official responsible for fielding sexual harassment complaints"), Jennings, 482 F.3d at 700, all have been deemed sufficient.
¶ 56 In S.S.'s case, several "appropriate persons" had knowledge of her victimization. Initially, we hold that assistant coach Kaligis and equipment manager Piro, even though the latter was S.S.'s work supervisor, do not fall into this category. Their duties are at a lower level, more akin to a classroom instructor. On the other hand, Ombudsman Price-Spratlen and Title IX Coordinator Remick clearly are "appropriate persons." Similarly, Athletic Director Hedges, who administers a multimillion dollar departmental budget and whose span of control involves the supervision of hundreds of student-athletes and student-employees, is also an "appropriate person." A similar conclusion is reached with regard to Assistant Athletic Director Tuite and Associate Athletic Director Burton. Each holds an administrative position involving the exercise of significant discretion and each plainly had the authority to "institute corrective measures." Gebser, 524 U.S. at 277, 118 S.Ct. 1989. Each was in a position to exercise control over the harasser and the context in which the harassment took place. Davis, 526 U.S. at 645, 119 S.Ct. 1661.
¶ 57 Thus, S.S. presented sufficient evidence on this element of her cause of action to warrant submission of the matter to a jury.

VIII.

The UW's Response Constituted Deliberate Indifference
¶ 58 A funding recipient acts with deliberate indifference when it responds to a report of a discriminatory act in a manner that is clearly unreasonable in light of all of the known circumstances. Davis, 526 U.S. at 629, 119 S.Ct. 1661. "[D]eliberate indifference will often be a fact-based question, for which bright line rules are ill-suited." Doe v. Derby, 451 F.Supp.2d at 447. Indeed, "the deliberate indifference or clearly unreasonable standard `does not lend itself well to a determination by the Court on summary judgment.'" Doe v. Green, 298 F.Supp.2d at 1036 (quoting Hart v. Paint Valley Local Sch. Dist., No. 02-01-004, 2002 WL 31951264, *9, 2002 U.S. Dist. LEXIS 25720, *31 (S.D.Ohio Nov. 15, 2002)).
¶ 59 The point at which notice of the harassment is given to the funding recipient is "the starting point for measuring the adequacy of its response." Doe v. Derby, 451 F.Supp.2d at 446. Thus, in a Title IX action wherein the underlying act of harassment was the rape of a 13-year-old female student by a 17-year-old male student, it was held:
While the Board may be liable for the post-assault school situation, there is no dispute that the Board did not receive notice of Porto, Jr.'s sexual assault of Sally Doe until after the rape took place and therefore, under Davis, the Board cannot be held liable for the sexual assault itself.
Doe v. Derby, 451 F.Supp.2d at 445-46.
¶ 60 An appropriate response, however, is required. "A school that knowingly condones sexual harassment between students has misused its power in much the same way that an employer does in a coworker sexual harassment case." Doe v. Oyster River Coop. Sch. Dist., 992 F.Supp. 467, 475-76 (D.N.H.1997).
¶ 61 Courts have found funding recipients' responses to notices of sexual harassment to be wanting in a variety of circumstances. An institution's failure to properly investigate a claim of discrimination is frequently seen as an indication of deliberate indifference. See, e.g., Jennings, 482 F.3d at 694; Vance, 231 F.3d at 259; Murrell v. Sch. Dist. No. 1, 186 F.3d 1238 (10th Cir.1999); Bruning v. Carroll Cmty. Sch. Dist., 486 F.Supp.2d 892 (N.D.Iowa 2007); Doe v. Oyster River, 992 F.Supp. at 481. Similarly, where an institution fails to notify law enforcement of a criminal act, or discourages the victim from reporting the act to law enforcement, this has been seen as an indication of deliberate indifference. *739 See, e.g., Franklin, 503 U.S. at 64, 112 S.Ct. 1028; Vance, 231 F.3d at 262; Murrell, 186 F.3d 1238. A school official's act of discouraging student victims from informing their parents of the harassment, based on fear of lawsuits, is viewed in the same way. Doe v. Oyster River, 992 F.Supp. at 481.
¶ 62 The funding recipient's failure to meaningfully and appropriately discipline the student-harasser is frequently seen as an indication of deliberate indifference. See, e.g., Davis, 526 U.S. at 635, 119 S.Ct. 1661; Williams, 477 F.3d 1282; Vance, 231 F.3d at 262; Murrell, 186 F.3d 1238; Doe v. Derby, 451 F.Supp.2d 438; Theno v. Tonganoxie Unified Sch. Dist. No. 464, 377 F.Supp.2d 952, 977 (D.Kan.2005); Doe v. Oyster River, 992 F.Supp. at 481 ("[W]hether [the] `punishment fit the crime'" is a measure of an appropriate response.); Seiwert v. Spencer-Owen Cmty. Sch. Corp., 497 F.Supp.2d 942 (S.D.Ind.2007).
¶ 63 The funding" recipient's minimization of the discriminatory import of sexual harassment or assault has also been seen as indicative of deliberate indifference. See, e.g., Jennings, 482 F.3d at 700 (university counsel told victim that "she should work out her problems directly with [her harassed"); Seiwert, 497 F.Supp.2d at 954 (victim told "some threats aren't as serious as others"); Kelly v. Yale Univ., No. 3:01-CV-1591, 2003 WL 1563424, *2, 2003 U.S. Dist. LEXIS 4543 at *3 (D.Conn. Mar. 26, 2003) (university dean publicly announced that sexual assault endured by student-victim "was not legal rape" in Connecticut). Where the response of the funding recipient has a negative impact on the victim and not on the abuser, this has been treated as an indication of deliberate indifference. Doe v. Dallas Indep. Sch. Dist., No. 3:01-CV-1092, 2002 WL 1592694, *7, 2002 U.S. Dist. LEXIS 13014 (N.D.Tex. July 16, 2002) (victim removed from class; abuser allowed to remain). Moreover, treating the abuser and the abused equally has been seen as being deliberately indifferent to the discriminatory acts. Seiwert, 497 F.Supp.2d at 954 (After a complaint followed by no disciplinary action, the harasser instigated an altercation at school. The school disciplined the harasser and the victim equally. This demonstrated deliberate indifference to the harassment.). It constitutes a deliberately indifferent response if the harasser and other students are left to believe that the harassing behavior has the "tacit approval" of the funding recipient. Seiwert, 497 F.Supp.2d at 954.
¶ 64 Conducting an investigation and then doing nothing more may also constitute deliberate indifference.
If this Court were to accept [the school district's] argument, a school district could satisfy its obligation where a student has been raped by merely investigating and absolutely nothing more. Such minimalist response is not within the contemplation of a reasonable response.
Vance, 231 F.3d at 260. This view of the law has been adhered to consistently.
Permitting a school district to avoid liability on the basis of some minimalist and ineffective response to discrimination would be inconsistent with the Supreme Court's ruling that responses which are "clearly unreasonable" constitute deliberate indifference.
Doe v. Green, 298 F.Supp.2d at 1036 n. 4.
¶ 65 The continuing use of "ineffective methods to no acknowledged avail" also constitutes deliberate indifference. Vance, 231 F.3d at 262; Canty v. Old Rochester Reg'l Sch. Dist., 66 F.Supp.2d 114 (D.Mass.1999). Thus, "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." Vance, 231 F.3d at 261. Accord Theno, 377 F.Supp.2d at 977 (talking to the harassers on several occasions but then taking no other action constituted deliberate indifference). Where the lack of remedial action results in the student-victim "believing another complaint to the school would have been a futile exercise," Doe v. Oyster River, 992 F.Supp. at 480, a jury question on the existence of deliberate indifference is presented.
*740 ¶ 66 S.S. has provided ample evidence to raise a jury question on the issue of the UW's deliberate indifference. A lack of appropriate discipline of her rapist, minimizing the effects of her rape, treating the victim equally with the rapist in the mediation process, allowing her rapist's denial of wrong-doing to be accepted at face value at the mediation, keeping the matter out of the public eye to avoid negative publicity, offering only a repeated mediation as an alternative remedial measure, discouraging S.S. from filing a police report, top administrators not notifying the UW's own police force of the report of a violent sex crime, repeatedly suggesting that S.S. leave her job with the football program while her rapist would re, main, wearing S.S. down until she believed that further complaints would be futile, a decision not to investigateor cause to be investigatedher rape report, andin the absence of a proper investigationquestioning her truthfulness when she expressed dissatisfaction with the results of the mediation are all claims supported by evidence in this case. Each of those claims finds support in the federal case law as an indication of deliberate indifference. At a minimum, a jury question is presented.
¶ 67 Without any citation to Title IX case authority, the UW in its briefing claims that S.S. has failed to offer proof that it caused her to suffer discrimination. This contention demonstrates a lack of understanding of causation in the Title IX context. As the Supreme Court explained:
These factors combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. Only then can the recipient be said to "expose" its students to harassment or "cause" them to undergo it "under" the recipient's programs.
Davis, 526 U.S. at 645, 119 S.Ct. 1661.
¶ 68 By submitting evidence that "appropriate persons," who had control over her rapist and the campus environment in which the rape occurred, had actual knowledge of the rape and responded in a deliberately indifferent manner, S.S. has submitted sufficient proof of causation in a Title IX cause of action to warrant submission of the claim to a jury.

IX.

The Discrimination Alleged by S.S. was Severe, Pervasive, and Objectively Offensive
¶ 69 The next question is whether S.S. has presented sufficient evidence to raise a jury question as to whether she was subjected to sex discrimination that was severe, pervasive, and objectively offensive. We conclude that she has.
¶ 70 There is no question that rape constitutes a severe form of sexual harassment and, accordingly, also constitutes a severe form of sex discrimination. There is also no question that it is "objectively offensive" to be raped. In addition, we note that "[t]he effect of such abusive conduct on a victim does not necessarily end with a cessation of the abusive conduct, particularly if the victim and the abuser retain the same or similar roles in an educational institution." Wills v. Brown Univ., 184 F.3d 20, 36-37 (1st Cir.1999).
¶ 71 To correctly analyze the sufficiency of the evidence to meet the requirements of this "element," however, we must first correctly describe S.S.'s claim. She does not claim that the university owes her damages for the rape committed by Alexander. To the contrary, her contention is that the institution should be responsible for that amount of the deleterious effects of the rape's aftermath that resulted from actions of the university. She urges that, by enacting Title IX, Congress did not intend only to eliminate acts of sex discrimination in educational settings but, rather, intended also to require the amelioration and minimization of the effects of such discriminatory acts when they do occur. In this regard, S.S. bases her claim on the allegation that the UW did not ameliorate the discrimination she suffered or seek to remedy its effects but, rather, exacerbated the damage done by the discrimination and enhanced its discriminatory impact. This, she claims, is the type of circumstance *741 that Title IX was designed to eliminate from education programs. We agree,
¶ 72 The UW maintains that S.S. does not state a proper Title IX claim because she was raped only once by Alexander and a single instance of sexual harassment cannot serve as the predicate for a Title IX cause of action. In making this assertion, the university relies on statements made by the Supreme Court in Davis. In Davis, the Court, in dicta, noted that "[a]lthough, in theory, a single instance of sufficiently severe one-on-one peer harassment could be" sufficient to support a claim, 526 U.S. at 652, 119 S.Ct. 1661, "we think it unlikely that Congress would have thought such behavior sufficient," 526 U.S. at 652-53, 119 S.Ct. 1661, given the "practical realities of responding to student behavior, realities that Congress could not have meant to be ignored." 526 U.S. at 653, 119 S.Ct. 1661. Thus, the university contends, because S.S. was raped only once, she does not have a cognizable Title IX claim against it.
¶ 73 We disagree. After reviewing the factual differences between this case and the Davis case, after considering the intent of Congress in enacting Title IX, and given the existence of federal decisions rejecting the very argument now made by the university, we hold that the private right of action implied in Title IX applies to claims such as that brought by S.S.
¶ 74 "Title IX is not a civility code." Jennings, 482 F.3d at 698. This truism was of great concern to the Supreme Court in Davis, a case involving sexual harassment among fifth grade students. In issuing its decision, the Court took great pains to make clear that it did not intend to federalize every instance of playground taunting or elementary classroom teasing. Thus, the Court made clear that "[d]amages are not available for simple acts of teasing and name-calling among school children . . . even where these comments target differences in gender." Davis, 526 U.S. at 652, 119 S.Ct. 1661. In making the comments relied on by the university, the Court also apparently intended that a single instance of somewhat more severely harassing behavior not be federalized.
¶ 75 However, the circumstances here are a far cry from those in Davis. No fifth graders are principals in this dispute. This claim involves the forcible rape, by means of penile-vaginal penetration, of a teenage college freshman by an adult football player. The act of sex discrimination here alleged was violent, criminal, and severe. It bears no resemblance to the fifth grade playground actions the possible federalization of which so troubled the Davis court.
¶ 76 Moreover, it must be kept in mind that S.S. seeks damages resulting only from the university's own actions. The concern in Davis, that a single act of inappropriate elementary school playground mischief might result in damages liability to a public school, is not present here. S.S. did not have to be raped twice before the university was required to appropriately respond to her requests for remediation and assistance. In the Title IX context, there is no "one free rape" rule.
¶ 77 In Davis, the Court cited the importance of congressional intent in reaching its decision. We are confident that our present holding is entirely consistent with the intent of Congress when it enacted Title IX.
¶ 78 In our examination of the congressional intent in enacting Title IX, we first observe the obvious.
It is always difficult to determine Congress' intent when dealing with the elements of an implied cause of action, because the text and legislative history of a statute that does not expressly create a cause of action is typically silent as to the parameters of the action.
Hawkins v. Sarasota County Sch. Bd., 322 F.3d 1279, 1287 (11th Cir.2003).
¶ 79 "It is Congress' intention in 1972 . . . that is of significance in interpreting Title IX." N. Haven Bd. of Edw. v. Bell, 456 U.S. 512, 529, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). We must "`attempt to infer how the [1972] Congress would have addressed the issue had the . . . action been included as an express provision in the statute.'" Gebser, 524 U.S. at 285, 118 S.Ct. 1989 (alteration in original) (quoting Cent. Bank of Denver, *742 N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 178, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)). This
endeavor inherently entails a degree of speculation, since it addresses an issue on which Congress has not specifically spoken. To guide the analysis, we generally examine the relevant statute to ensure that we do not fashion the scope of an implied right in a manner at odds with the statutory structure and purpose.
Gebser, 524 U.S. at 284, 118 S.Ct. 1989 (citations omitted).
¶ 80 In determining intent, we first recognize that "[t]he statute is broadly worded." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 179, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005). The Supreme Court has previously determined that "[t]here is no doubt that `if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language.'" North Haven Bd. of Educ., 456 U.S. at 521, 102 S.Ct. 1912 (quoting United States v. Price, 383 U.S. 787, 801, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966)). Moreover, "`[d]iscrimination' is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach." Jackson, 544 U.S. at 175, 125 S.Ct. 1497. "Because Congress did not list any specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered." Jackson, 544 U.S. at 175, 125 S.Ct. 1497.
¶ 81 The Supreme Court has repeatedly noted "Title IX's `unmistakable focus on the benefited class.'" Davis, 526 U.S. at 639, 119 S.Ct. 1661 (quoting Cannon v. University of Chicago, 441 U.S. 677, 691, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)). "Title IX's beneficiaries plainly include all those who are subjected to `discrimination' `on the basis of sex.'" Jackson, 544 U.S. at 180 n. 3, 125 S.Ct. 1497 (quoting 20 U.S.C. § 1681(a)).
¶ 82 The goals of the legislative proponents of Title IX are clear. "Congress enacted Title IX not only to prevent the use of federal dollars to support discriminatory practices, but also `to provide individual citizens effective protection against those practices.'" Jackson, 544 U.S. at 180, 125 S.Ct. 1497 (quoting Cannon, 441 U.S. at 704, 99 S.Ct. 1946). Accord Gebser, 524 U.S. at 286, 118 S.Ct. 1989. "Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe." Franklin, 503 U.S. at 75, 112 S.Ct. 1028.
¶ 83 S.S. claims that Title IX is intended to accomplish both the prohibition of discriminatory acts and the elimination of the effects of such discrimination. The UW, on the other hand, essentially argues that Title IX's focus is only on acts of discrimination, not on its effects. We find the university's suggested multiple-discriminatory act requirement at odds with the intent of Congress in enacting Title IX. The effects of discrimination upon those in the protected class was clearly of concern to the 1972 Congress. Congress clearly desired to eliminate or minimize those effects. Consequently, the UW may be held liable for exacerbating those effects to S.S.'s detriment.
¶ 84 We find support for this conclusion in the federal case law. Several courts have held that a single act of severe sexual harassment can support a Title IX cause of action. As held by the Sixth Circuit Court of Appeals, one incident can satisfy a claim. Vance, 231 F.3d at 259, 259 n. 4 (quoting Doe v. School Admin. Dist. No. 19, 66 F.Supp.2d 57, 62 (D.Me.1999) ("Within the context of Title IX, a student's claim of hostile environment can arise from a single incident.")). Accord Dallas Ind. Sch. Dist., 2002 WL 1592694, 2002 LEXIS 13014 (single act of manual penetration of student-victim's vagina coupled with school administrators' actions which exacerbated the discriminatory effects of the abuse).
¶ 85 A lengthy analysis of this question appears in. Doe v. Derby, 451 F.Supp.2d 438. In that case, a 13-year-old female student who was about to enter the eighth grade was sexually assaulted during summer recess, and off school grounds, by a 17-year-old male high school student. The middle school and the high school held classes in the same building. There was a single incident of *743 sexual assault. There was no evidence that the boy ever personally harassed the girl after the incident. He was suspended from school for ten days. After her eighth-grade year, the girl transferred to another school.
¶ 86 The court held that the elements of a Title IX cause of action were stated.
The evidence shows that Porto, Jr. [the abuser] was permitted to continue attending school in the same building as Sally Doe [the victim] after the assault, leaving open the constant potential for interactions between them, and indeed Sally Doe states in her affidavit that she saw Porto, Jr. frequently during the school year. . . . . [T]his evidence could support a reasonable jury conclusion that these circumstances rose to the level of "severe, pervasive, and objectively offensive" under Davis.

Doe v. Derby, 451 F.Supp.2d at 444. The court then elaborated upon its holding, discussing the facts of its case in conjunction with the facts of another case, also in which a single act of rape had been held sufficient to support a Title IX cause of action.
In Kelly, the plaintiff, a sexual assault victim, continued to attend Yale Divinity School with her attacker. Although she had no interactions with, and was not harassed by, her attacker after the assault, his "presence on campus and the accompanying risk that she might encounter him created a hostile environment that effectively deprived her of the educational opportunities or benefits provided by the school." Kelly, 2003 WL 1563424, at *3, 2003 U.S. Dist. LEXIS 4543. The court held that a reasonable jury could find that "following the assault, [the attacker's] presence on campus was harassing because it exposed her to the possibility of an encounter with him." Id. In similar fashion, Sally Doe was constantly exposed to a potential encounter with her assailant because Derby High School and Middle School were housed in the same building such that students from each could readily come in contact with each other, In fact, Sally' Doe's affidavit states that she saw Porto, Jr. many times during the school year and that the experience of seeing him "was very upsetting" and made the "school year very hard." Thus, even absent actual post-assault harassment by Porto, Jr., the fact that he and plaintiff attended school together could be found to constitute pervasive, severe, and objectively offensive harassment.
Doe v. Derby, 451 F.Supp.2d at 444. See also Morse v. Univ. of Colo., 154 F.3d 1124 (10th Cir.1998) (combination of acts of student-teacher that exacerbate the effects of peer harassment and the peer harassment supported a claim).
¶ 87 In summary, as a result of our review of congressional intent and as a result of our examination of federal decisional authority, we conclude that the single act of rape committed upon S.S. is sufficient to support her claim. In so holding, we emphasize that S.S. may not recover damages for the rape itself but, rather, may only recover based on injury done to her by actions of the university after she reported the rape.

X.

The Discrimination Deprived S.S. of Equal Access to Educational Opportunities or Benefits
¶ 88 The university next contends that S.S. did not establish that she suffered cognizable injury and that, accordingly, her claim was properly dismissed. In making this argument, the university contends that inasmuch as S.S. remained enrolled in school and continued with her work in the athletic department she has not proved that she was "effectively barred" from educational opportunities as required by Davis. We disagree.
¶ 89 Under the rule announced in Davis, a total bar or exclusion from education opportunities need not be demonstrated. It is the denial of "equal access to an institution's resources and opportunities" that is the key. Ray v. Antioch Unified Sch. Dist., 107 F.Supp.2d 1165, 1168 (N.D.Cal.2000) (quoting Davis, 526 U.S. at 650, 119 S.Ct. 1661). Thus, where the student-plaintiff submitted proof that sexual harassment caused her fear and emotional distress that had "concrete, negative effects on [the student's] ability to receive an education," Ray, 107 F.Supp.2d at *744 1171, she had been denied "equal access" to that education.
¶ 90 Other courts have expressed a similar view. In the First Circuit, it has been held that sufficient evidence of injury has been shown if there is proof that the effects of sexual harassment "compromise the victim's . . . educational opportunities." Wills, 184 F.3d at 26. This standard was later applied by the same court in Frazier, 276 F.3d at 65 (The measure of cognizable injury is whether the effects of the sexual harassment "compromise or interfere with educational opportunities normally available to students.").
¶ 91 In the Second Circuit, a similar rule has been announced. Where sexual harassment of a student "created a disparately hostile educational environment relative to her peers, the above-described harassment could be construed as depriving [the student-victim] of the benefits and educational opportunities available at SUNY New Paltz." Hayut v. State Univ. of N.Y., 352 F.3d 733, 750 (2d Cir.2003). Thus, access to educational benefits is not "equally available" if the educational environment is "disparately hostile."
¶ 92 The concern of equality in access to educational benefits is at the heart of Title IX. Indeed, "one of the primary purposes behind the Act [is] to ensure equal access." Doe v. Oyster River, 992 F.Supp. at 475. Not just a total bar, but the denial of equal access is the concern.
[A] sexually harassed student may likewise be cut off on the basis of sex from the privileges attending the full enjoyment of an education. Since a good education leads to access to jobs, discrimination in education "is doubly destructive for women." See 118 Cong. Rec. at 5804 (1972) (Comments of Sen. Bayh, sponsor of Title IX.).[[11]]
Doe v. Oyster River, 992 F.Supp. at 475.
¶ 93 The Fourth Circuit recently addressed the question of the predicate showing of injury necessary to state a cognizable Title IX claim. In Jennings, the court observed:
Specifically, Title IX states that a covered institution cannot, on the basis of sex, (1) "exclude[] [a person] from participation in," (2) "den[y] [a person] the benefits of," or (3) "subject[ ] [a person] to discrimination under any education program or activity." 20 U.S.C. § 1681(a). Davis hews to the statute in pointing out that sexual harassment reaches the level of actionable discrimination when it has "a concrete, negative effect on [the victim's] ability" to participate in a program or activity. See Davis, 526 U.S. at 654, 119 S.Ct. 1661.
Jennings, 482 F.3d at 699 (alteration in original). The court further explained:

Davis explains that a sexual harassment victim "can be said" to have been deprived of access to educational opportunities or benefits in several circumstances, including when the harassment (1) results in the physical exclusion of the victim from an education program or activity; (2) "so undermines and detracts from the victim['s] educational experience" as to "effectively deny her] equal access to an institution's resources and opportunities"; or (3) has "a concrete, negative effect on [the victim's] ability" to participate in an educational program or activity. [Davis, 526 U.S.] at 650-51, 654 n. 2[, 119 S.Ct. 1661]. These alternative ways of showing deprivation or harm are rooted in the statute.
Jennings, 482 F.3d at 699. An effect is "concrete" if it is "real," "negative, and substantial." Jennings, 482 F.3d at 699.
¶ 94 The court in Jennings also rejected the notion that the student should lose her cause of action as a result of being resilient. Of the student-victim's attempts to work through her difficulties, thus, in effect, mitigating her damages, the court noted that, "[i]f anything, it shows how hard Jennings was trying, and what she believed she was achieving, in spite of the hostile environment." Jennings, 482 F.3d at 700.
*745 ¶ 95 Two concurring judges agreed. They noted that the sexual harassment Jennings endured from her college soccer coach "ma[de] it much more difficult for her to develop and achieve as a student-athlete." Jennings, 482 F.3d at 705 (Gregory, J., concurring). The concurring judges criticized the position advocated by the dissent, which mirrors the UW's present claim.
In essence, the dissent concludes that because Jennings did her best to avoid [the coach-harasser] and his abuse, but still made the most of her time on the team and as a student at UNC, she has forfeited her cause of action. This implication turns Title IX on its head.
Jennings, 482 F.3d at 707 (Gregory, J. concurring). Jennings, it was concluded, had been "denied . . . equal access to the benefits of team membership." Jennings, 482 F.3d at 707 (Gregory, J. concurring).
¶ 96 S.S. submitted to the trial court evidence of her distress, anxiety, and emotional hurt. She presented evidence that this interfered with her studies. She provided evidence that the enjoyment of her student employment opportunities was compromised by the actions of university officials, including the repeated suggestion that she leave her job to avoid further difficulties. In short, she presented evidence that the university's handling of her rape report resulted in her being denied the full benefit of her educational experience both in the classroom and in the athletic department. At a minimum, a jury question is presented as to whether these effects are "real," "negative," and "substantial." If the jury so finds, it will be entitled to find that S.S. was denied the equality of access that Title IX was enacted to afford.
¶ 97 S.S. provided sufficient evidence of cognizable injury to warrant submitting her claim to a jury.

XI.

Decision
¶ 98 The trial court's dismissal of S.S.'s claim brought pursuant to 42 U.S.C. § 1983 is affirmed. The trial court's dismissal of S.S.'s claim brought pursuant to Title TX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, is reversed. The cause is remanded to the superior court for further proceedings consistent with this opinion.
¶ 99 Affirmed in part, reversed in part, and remanded to the superior court.
WE CONCUR: BAKER and BECKER, JJ.
NOTES
[1] In her briefing on appeal, S.S. concedes that the trial court correctly dismissed her § 1983 claim. Thus, we affirm the trial court's ruling on that issue without further discussion.
[2] The parties dispute many of the facts at issue in this case. As herein discussed, in reviewing the trial court's ruling on summary judgment we view all facts and inferences therefrom in the light most favorable to the non-moving party, S.S. CR 56(c). Accordingly, the facts iterated herein are those most favorable to S.S.'s case that may be found from the evidence presented to the trial court. We, of course, express no opinion as to the truth of this evidence, a determination that must be preceded by a trial on the merits.
[3] The UW's brief describes Burton as an associate athletic director. S.S.'s brief describes Burton as the "head trainer." S.S.'s brief also describes Burton as an "assistant athletic director for student services."
[4] The UW's ombudsman is appointed by the president "to assist in the protection of the rights and interests of individual members of the student body, the faculty, and the staff against arbitrary and capricious action or lack of appropriate action by University agencies, the student body, the faculty, or the staff." The ombudsman is charged with the authority to receive complaints from students with regard to "alleged inequities," to seek to resolve such inequities, and "recommend to the President redress when the Ombudsman believes that an individual has been improperly treated and when the Ombudsman has been unable to resolve the matter."
[5] Other options available to UW students who are victims of sexual assault include referral to the Sexual Assault and Relationship Violence Information Service (SARIS) (an on-campus sexual assault resource program operating under the auspices of the University of Washington Office of the Vice President for Student Affairs that provides information, advocacy, and referral to other sexual assault resources), on-campus judicial proceedings available through the Office of the Vice President of Judicial Affairs, and referral to law enforcement agencies.

Rachelle White, the director of SARIS, had previously objected to Price-Spratlen's mediation of sexual assaults. S.S. avers that this dynamic is one reason that she was not referred to SARIS.
S.S. was provided with a brochure that refers to resources available to victims of sexual harassment. S.S. did not believe that such resources were applicable to her situation, however, as she characterized the incident with Alexander as rape or sexual assault, rather than sexual harassment.
[6] In the spring of 2002, S.S. contacted the King County Sexual Assault Resource Center and, subsequently, the King County Prosecutor's office to determine whether to file a police report regarding the rape. A prosecutor informed S.S. that it would be unlikely charges would be filed considering the passage of time. Accordingly, S.S. decided not to file a police report.
[7] In his declaration, S.S.'s counselor stated, "S.S. presented in counseling to deal with issues related to inability to concentrate, intrusive thoughts, difficulties sleeping, grinding teeth, and general feelings of anxiety and depression related to being sexually assaulted and her experience of the mediation process she went through at the University of Washington Ombudsman's Office. She reported feeling dismissed and unheard through the process of mediation, stating that the University of Washington Ombudsman's Office appeared to take the perpetrator's side and imposed minimal consequences so that her experience w as trivialized. She indicated that the questioning of her truthfulness and credibility was devastating . . . S.S. reported that she continued to work at the UW Athletic Department where she had contact with the man who assaulted her. She reported feeling angry and upset whenever she had contact with him, whether at work or on campus, but refused to give up her job. She indicated that to quit her job would mean that he had `won.'" (Emphasis added.)
[8] In response to the UW's motion for summary judgment, S.S. submitted the declarations of two additional witnesses who also opined as to the propriety of resolving sexual assault by mediation. Expert witness Mary Koss, a professor at the University of Arizona with joint appointments as Professor of Psychology, Professor of Family and Community Medicine, and Professor of Psychiatry, stated in her declaration that:

Mediations are an inappropriate method of dealing with a sexual assault, and particularly as conducted in this case. The implication from mediation is that S.S. is as much to blame for the situation as Roc Alexander. S.S. was never encouraged to contact an advocate. She participated in a process that contemplates people of equal resources to speak and be heard, and proceeds without the assumption that there is a wronged party and a responsible person.
Expert witness Connie Best, a Professor of Psychiatry at the Medical University of South Carolina, responsible for investigating and resolving sexual assault and harassment complaints, similarly stated in her declaration that: "Mediation is an inappropriate method of handling a sexual assault claim because it trivializes the complaint by implying that the victim is partially at fault or has misunderstood the conduct."
The UW cites to several sources that indicate that some universities offer mediation between a victim and his or her alleged assailant when "an allegation of sexual assault is raised, as one option available amongst other options to be selected by the alleged victim.
[9] Rulings on P.L.'s claims against Roc Alexander and the University of Washington are not at issue in this appeal.
[10] U.S. Const. art. I, § 8, cl. 1.
[11] "Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, arc an authoritative guide to the statute's construction." North Haven Bd. of Educ., 456 U.S. at 526-27, 102 S.Ct. 1912. Indeed, "Senator Bayh's statements . . . are the only authoritative indications of congressional intent[.]" North Haven Bd. of Educ., 456 U.S. at 527, 102 S.Ct. 1912.